750 So.2d 893 (1999)
STATE of Louisiana
v.
Cedric D. EDWARDS.
No. 97-KA-1797.
Supreme Court of Louisiana.
July 2, 1999.
*896 Gerald J. Block, Lafayettte, Counsel for Applicant.
Hon. Richard P. Ieyoub, Atty. Gen., Hon. Paul Carmouche, Dist. Atty., Catherine M. Estopinal, Donald E. Hathaway, Jr., Shreveport, Counsel for Respondent.
KNOLL, Justice.[*]
Cedric Edwards was indicted for the first degree murder of Victoria Catanese Kennedy in violation of La.R.S. 14:30. After a trial by jury, defendant was found guilty as charged. The defendant moved for a new trial and for judgment of acquittal, which were denied. A sentence hearing was conducted before the same jury. Jurors voted unanimously to impose the death penalty, having found the following statutory aggravating circumstances: that the killing occurred during the commission or attempted commission of an armed robbery and/or aggravated burglary; and that the offender knowingly created a risk of death or great bodily harm to more than one person. La.C.Cr.P.art. 905.4(A)(1), (4). In accordance with the determination of the jury, the trial judge sentenced defendant to death.
On appeal, defendant raises thirteen assignments of error for reversal of his conviction and sentence. Finding no reversible *897 error, we affirm the defendant's conviction and sentence.

FACTS
In Shreveport, Louisiana, on October 27, 1995, Victoria Catanese Kennedy, her husband Gerald Kennedy, and his 14-year old daughter Belinda had gone to a revival and had then stopped to close up their family business, Victoria's Catanese Grocery. After driving their help home, Kennedy, Victoria, and Belinda returned to their own home, a second-floor apartment at the Villa Del Lago Apartments. Upon their arrival home shortly before midnight, Victoria and Belinda were in the kitchen preparing something to eat while Kennedy cleaned out the trash can on the breezeway just outside the kitchen.
While on the breezeway, Kennedy saw a man moving suspiciously among the cars in the parking lot. The man saw Kennedy watching and moved off behind one of the buildings in the complex. Now alerted, Kennedy heard a noise from the stairwell. He looked down over the bannister and saw another man hunched over. Now discovered, the man stood up, made eye contact, began climbing the stairs, raised a gun, and fired a shot at Kennedy.
The bullet struck Kennedy in the upper right arm, fracturing the bone and spinning the limb grotesquely up, over, and behind his neck. Racing for the kitchen, Kennedy shouted for Victoria and Belinda to run or hide. He tried but failed to lock the kitchen door behind him, and ran into the master bedroom to retrieve a firearm. Victoria and Belinda ran from the kitchen and through the living room, where they tripped and fell. Belinda crawled underneath a small antique-type couch supported on queen anne wooden legs. From there she saw the assailant's face and witnessed the violent events.
The defendant entered the home, started to go after Kennedy, but then changed directions and moved toward Victoria. At close range, the intruder shot Victoria twice in the head. The first bullet, which shattered her jaw and exited on the other side of her head by her left ear, failed to take Victoria's life. As she lay face down on the floor, the attacker pressed the barrel of his gun to the back of her head and fired a second time, discharging the fatal bullet.
By this time Kennedy was emerging from the bedroom, armed with a TEC-9mm semi-automatic weapon. Because the gunshot wound had rendered Kennedy's dominant right arm useless, Kennedy held the weapon awkwardly in his left hand. It is unclear exactly how Kennedy landed on the floor. It is evident that the defendant disarmed him and either shot him with the TEC-9 or grabbed Kennedy and threw him onto the floor. From that position, defendant pressed his knee into Kennedy's back and pistol-whipped him about the head, demanding: "Where is the money?" At some point, the TEC-9 magazine clip fell out. Sometime during the beating, Kennedy directed Victoria: "Give him the money." Defendant replied: "Don't call on her because she already dead." R. at 1692. Belinda, who had been witnessing the events, then closed her eyes.
During the beating, Kennedy received multiple skull fractures and drifted into semi-consciousness. He heard a second man's voice say: "We've been here too long. Let's go." R. at 1665. Shortly after, defendant delivered some final blows and left, taking the TEC-9 with him.[1]
When Belinda opened her eyes, she saw her father lying on the floor and went to his assistance. Kennedy told her to call 911. He said to tell the police that he recognized the perpetrator and identified him as "Skeeter Man" and "Gunslinger." Then he asked his daughter to help him sit up because he did not want to die on the floor. Belinda called the police and also *898 gave them a description of the man she saw shoot Victoria and beat her father.
When the investigators arrived, Victoria Kennedy was found dead at the crime scene. Gerald Kennedy was taken to the Louisiana State University Medical Center for treatment. There, Kennedy was diagnosed as suffering from a depressed skull fracture to the back of his head, a separate fracture in the frontal skull area, and a gunshot wound to his right arm. Within a few hours of the murder, investigators interviewed Kennedy at the hospital. Before the interview, Kennedy had received no medication that might have dulled his senses because the doctors were concerned about his condition.
At the hospital interview Kennedy told investigators that he had heard two male voices in his apartment, but that he had seen only defendant inside. Kennedy knew defendant and had seen him just a week before the murder; the defendant had entered their grocery store, bought a beer, and smirked at Kennedy. Kennedy did not know defendant's given name, but knew him by his street names: "Skeeter" and "Gunslinger." Kennedy also knew that defendant had a brother named Kevin Earl who belonged to the Bottoms Boyz gang. When investigators showed Kennedy a photo array, Kennedy identified the defendant. Kennedy positively identified defendant again at trial.
Investigators went to interview Belinda at her relative's home about six hours after Belinda had called the police to report the crime. Belinda was awakened and, after about five minutes, investigators asked her to identify the perpetrator from a photo arraythe same one shown Kennedy. At the time, she selected defendant and another man. At trial, Belinda positively identified defendant.
Detectives had searched their Bottoms Boyz gang files in the hours after the shooting and found Kevin Earl Edwards on the list. Kevin Earl's arrest record named a brother: Cedric Edwards. Following up on the lead, investigators learned that the defendant had been living with his girl friend Teri Williams in a home she shared with her mother, Gwendolyn Morris, and her two children fathered by the defendant.
A few days after the murder, investigators visited the Morris/Williams home where a consent to search form was executed by Ms. Morris as head of household. Ms. Williams then led investigators to the room she shared with defendant and assisted investigators in their search, laying out a selection of defendant's clothing in accordance with the descriptions they gave. A detective noticed that a tennis shoe on the floor near the bed had a smudge that resembled dried blood. Ms. Williams identified the shoe as defendant's and the detective secured the pair of shoes as evidence. DNA testing revealed the smudges to be dried blood matching that of Gerald Kennedy.
The theory of the prosecution was that the defendant had specific intent to kill and had killed during the commission or attempted commission of an aggravated burglary, armed robbery or while he had specific intent to kill or inflict great bodily harm upon more than one person. La.R.S. 14:30(A)(1), (3). The State argued that aggravated burglary was satisfied because the defendant had made an unauthorized entry while armed, that the intent to commit a felony was demonstrated by defendant's firing at Kennedy even before entry, and that defendant had committed a battery upon defendant when he shot him in the arm and when he pistol-whipped him inside the apartment.[2] The State *899 urged that the elements of armed robbery or attempted armed robbery had also been satisfied because the defendant demanded money while beating Kennedy with the gun.[3] Finally, the State urged that defendant's intent to kill more than one person was evident: defendant had first attempted to kill Kennedy on the breezeway, and then again inside the apartment when he beat Kennedy to the point of semi-consciousness. Additionally, there was evidence that defendant may have shot Kennedy with the TEC-9. An undamaged bullet that had been fired from the TEC-9 was recovered from the living room floor by crime scene technicians. Blood on the bullet jacket matched Kennedy's. The State theorized that the TEC-9 bullet, by some fluke, had entered the fatty tissue at the back of Kennedy's neck below the cranium, passed between the skull and skin, and exited in a relatively undamaged condition, landing on the living room floor.
The State's case included presentation of defendant's smudged tennis shoe that had been retrieved from defendant's and Ms. Williams' bedroom. DNA testing revealed that the chance that the blood came from an African-American other than Gerald Kennedy was 1:1,300,000.
During his trial testimony, Gerald Kennedy acknowledged that before 1992 he had earned a living by dealing drugs. He had two convictions for marijuana possession in the 1980s, and in 1992 was sentenced for possessing over twenty-eight grams of cocaine. He also testified that he had formerly associated with a neighborhood gang called the Bottoms Boyz. Kennedy said that he had never been a member, but had maintained cordial relations until he appeared before a federal grand jury in 1992 and 1993, testifying against the group. With his help, a number of the gang members were indicted and imprisoned. After Kennedy was paroled in December, 1994, he did offshore work for several months and then returned to Shreveport to be with his wife Victoria. Thereafter, he worked at his wife's grocery store about twelve hours a day and attended the Word of Life Church, where he was an usher and his wife was a counselor.
After his parole, Kennedy was harassed by members of the gang, and threats were made against him and his family.[4] One gang member flashed a copy of the transcript of Kennedy's grand jury testimony and threatened to distribute more copies around town unless Kennedy paid for his silence. After consulting with his wife, Kennedy refused to pay.
In January, 1996, two months after Victoria's murder, Kennedy was again asked to testify in a trial against a member of the Bottoms Boyz gang. Kennedy refused. As a result, Kennedy was jailed for contempt and his parole was revoked. When the instant capital case came to trial a year later, Kennedy was still in jail.
Defendant relied upon alibi as his defense. Ms. Williams and Gwendolyn Morris, Williams' mother, each testified that defendant was at home on the night of the murder.
After deliberating two hours, jurors found the defendant guilty of first degree murder as charged.
In his opening remarks at the penalty phase, the district attorney told jurors that the defendant had killed before and urged them to evaluate carefully the quality of any mitigating evidence presented. The defense counsel told the jury that it had "made the right decision" and that following his conviction at the guilt stage, the defendant "finally dealt with us truthfully and honestly about what happened." R. at 1976. Counsel promised that defendant *900 would testify to explain what happened on the night Victoria was murdered. Counsel advised the jury that they would also hear mitigating evidence of defendant's creativity and artistic nature.
State's evidence during the penalty phase consisted of testimony from Victoria's adult daughter that she was close with her mother and missed her, and testimony from an eyewitness of how defendant shot and killed another victim in connection with a drug sale previous to Victoria's murder.[5]
The defense presented Mark Vigen, Ph. D., as its expert in forensic psychology. Dr. Vigen testified that he was familiar with the mitigating factors set forth in the Code of Criminal Procedure that the jury was required to consider and that defendant satisfied none of them. Dr. Vigen was then asked to relate to the jury defendant's psychological profile in support of mitigation. Dr. Vigen offered that there was a high probability that defendant had some identified learning disability, that he had an early history of drug and alcohol abuse that interfered with judgment and control, that defendant has some underlying personality disturbance made up of emotional distancing and instability that did not rise to a mental illness, that he refused to blame others, that he had good artistic abilities, that he took advantage of educational opportunities while at Wade Correctional, that he had a relationship with his children, and that he would do well in the penitentiary with a life sentence. On cross-examination jurors learned that defendant got into fights with other prisoners and that Dr. Vigen's assessment that defendant would do well in prison was based on general actuarial figures that fighting decreased as prisoners aged. Dr. Vigen could not say that defendant would never kill again
Defendant testified on his own behalf. He presented jurors with products of his artistic handiwork including decorative love letters to Ms. Williams and a clock with attached picture frames encasing smiling photos of his two children. Defendant also removed any lingering doubt that jurors might have had by admitting that he killed Victoria Kennedy. He explained that he and two others, whom he did not name,[6] had gone to Kennedy's apartment with an intent to kidnap him because of a "bad debt." Defendant stated that he had not intended to harm Victoria Kennedy, but that things had spun out of control. Jurors heard defendant's explanation that Victoria's death, caused by a second bullet fired assassination style,[7] "just happened." R. at 2024, 2027.
Jurors deliberated one hour and returned with a verdict for death, finding all aggravating circumstances urged by the state. This direct appeal followed. La. Const.art. V, § 5(D).[8]

PRE-TRIAL ISSUES

Assignment of Error No. Two
Defendant complains that the trial court erred in denying his motion to suppress a pair of tennis shoes, arguing that the shoes were illegally obtained. Two days after the homicide, detectives went to *901 the home of Gwendolyn Morris and her daughter Teri Williams. Morris answered the door and, in response to the detectives' inquiry, identified herself as head of the household and verified that defendant had been staying at their home for about the past two months. After detectives explained the nature of the case and asked permission to search the premises, Morris agreed and signed a consent form. Morris said that she had nothing to hide and requested that the search be completed before her grandchildren returned from school. Williams did not sign a consent form and was not specifically asked if the detectives could search the room she shared with defendant, but Detective Eatman testified that she orally consented. Williams identified and led detectives to their bedroom, which was not locked, was present at all times, and assisted in the search. She laid out defendant's clothes in order for the detectives to select items matching the witnesses' description. She identified a pair of K-Swiss tennis shoes that belonged to defendant that were on the floor near the bed. Detective Eatman, observing smudges that resembled dried blood, secured the shoes as evidence. At the January 22, 1997 pre-trial motion to suppress hearing, Williams testified that she agreed with Morris and that she wanted the detectives to search the home and leave before her children arrived from school. The record is void of any evidence that either Morris or Williams felt coerced or that the consent to the search was anything but voluntary. The defense conceded that Morris freely and voluntarily consented to the search. Morris herself testified: "They didn't threat[en] or nothing." R. at 925.
Warrantless searches and seizures fail to meet constitutional requisites unless falling within one of the narrow exceptions to the warrant requirement, such as a search conducted pursuant to consent. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Owen, 453 So.2d 1202, 1206 (La.1984); State v. Packard, 389 So.2d 56, 58 (La.1980), cert. denied, Packard v. La., 450 U.S. 928, 101 S.Ct. 1385, 67 L.Ed.2d 359 (1981). Consent may be given by one having "common authority" over the premises sought to be searched. Common authority is based on "mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171, 172 n. 7, 94 S.Ct. 988. A warrantless search may be valid even if consent was given by one without authority, if facts available to officers at the time of entry justified the officers' reasonable, albeit erroneous, belief that the one consenting to the search had authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 185-89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); State v. Stewart, 27,049 (La.App. 2 Cir. 5/10/95), 656 So.2d 677, writ denied, 95-1764, 95-1768 (La.12/8/95), 664 So.2d 420. It is clear that, under the facts, officers reasonably believed the consent to be valid.
Nevertheless, defendant argues that consent was invalid because defendant had a reasonable expectation of privacy in his own bedroom. However, the facts do not support a position that defendant had a reasonable expectation of privacy because there was no area over which he had exclusive use. State v. Cover, 450 So.2d 741, 746 (La.App. 5 Cir.), writ denied, 456 So.2d 166 (La.1984); See also State v. Abram, 353 So.2d 1019 (La.1977), cert. denied, 441 U.S. 934, 99 S.Ct. 2058, 60 L.Ed.2d 663 (1979). Therefore, defendant failed to rebut the valid consent to the search given by one whom the detectives reasonably believed had authority to permit the search. See State v. Owen, 453 So.2d 1202 (La.1984) (where trailer owner's consent to search of premises, including areas used by guest, resulted in seizure of admissible evidence against the guest); State v. Washington, 407 So.2d 1138 (La.1981). The trial court properly denied defendant's motion to suppress.
This assignment of error is without merit.

*902 Assignment of Error No. One

The defense filed a motion in limine seeking to prevent the state from referring to the defendant by his nickname of "Gunslinger." At a pre-trial hearing, the defense argued that no nickname should be mentioned or that the more neutral "Skeeter" should be used since "Gunslinger" was highly prejudicial and lacked evidentiary value. The state agreed that "Gunslinger" was prejudicial but that its use was relevant as identity of the murderer was at issue. The trial judge denied the motion and refused to prohibit its use, ruling that the probative value of the name "Gunslinger" clearly outweighed the potential prejudice. The trial judge did, however, offer to admonish the jury to consider the name only for identification purposes.
On the morning of trial, the defense renewed its objections and sought to prohibit the district attorney from using "Gunslinger" in his guilt phase opening statement. The judge denied the motion. The court reiterated that both nicknames were admissible to prove identification, an element the State was required to prove beyond a reasonable doubt. The court also indicated that it did not want to control the district attorney's presentation. Defendant complains of the rulings, contending that repeated use of this "malevolent reference" was reckless and negated the presumption of innocence.
The defense gave notice of an alibi. Therefore, identity was a key issue at trial. When identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Smith, 430 So.2d 31, 45 (La.1983). To establish the identity of an offender, aliases, nicknames or descriptions by race, color or otherwise are not only permissible, they constitute competent, relevant, and fully admissible evidence. State v. Mitchell, 412 So.2d 547, 552 (La.1982) (when the victims did not know all of their fellow inmates by name, identifying the culprits by race and color was permissible); State v. Foote, 379 So.2d 1058, 1059-1060 (La.1980) (court accepts victim's identification of perpetrator by nickname).[9] Pursuant to La.C.Cr.P. art. 766, the state is required to explain the nature of the charge and to set out in general terms the nature of the evidence in its opening statement. Therefore, if use of the nickname was permissible to prove identity during the guilt phase, then its use during State's opening was permissible as well.
In the case sub judice, the defense was aware through copies of supplemental police reports and other documents furnished during discovery that Gerald Kennedy knew his attacker, but did not know his proper name. Gerald Kennedy knew that defendant went by the street names "Skeeter" and "Gunslinger." Kennedy *903 also knew that defendant had a brother who belonged to the Bottoms Boyz gang. The combined information led investigators to learn defendant's proper name, to locate his whereabouts, and to obtain evidence that further identified defendant as the one who shot and beat Kennedy, and mortally wounded his wife Victoria.
In meeting its obligation to negate any reasonable probability of misidentification, the state was entitled to present the entire process by which the defendant was identified and linked to the homicide, including use of nicknames. Since the nickname "Gunslinger" was relevant in identifying defendant as the perpetrator, its use was permissible. Mitchell, 412 So.2d at 552; Foote, 379 So.2d at 1058. That an alias or street name or other relevant identification is unflattering or casts an accused in a poor light does not alone render it inadmissible or vitiate defendant's presumption of innocence. See Jackson and Foote, supra. See also Dawson v. Delaware, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). Jurors were properly charged at the conclusion of the guilt phase that the presumption of innocence may be overcome only by proof of each element of the crime beyond a reasonable doubt.
While identity was not at issue in the penalty phase, the State referred to defendant as "Skeeter" ten times and as "Gunslinger" just once. Even assuming that the solitary reference contravened La. Code Crim.P. art. 774, which provides in pertinent part: "The argument shall not appeal to prejudice," that alone does not constitute reversible error. Only errors which affect substantial rights are grounds for reversal. La.Code Crim.P. art. 921; State v. Gibson, 391 So.2d 421 (La.1980). In this case, the evidence used to convict defendant was overwhelming: the State produced eyewitnesses to the crime who positively identified defendant; and corroborating evidence placed defendant at the crime scene. In the penalty phase, defendant admitted the killing and could offer no statutory mitigation. Under the totality of the circumstances, use of defendant's street name "Gunslinger" more often than necessary for identification, if in error, was surely harmless.
This assignment of error is without merit.

VOIR DIRE

Assignment of Error No. Ten
The defense claims that the trial court erred in granting State's challenges for cause, thereby excluding prospective jurors Ann Lauelle and Mary Breedlove. The defense recognized that Lauelle's responses concerning her views on capital punishment reflected ambivalence and caution. However, the defense argues that she also demonstrated an open-mindedness and a willingness to listen. The defense acknowledged that Breedlove, too, was greatly troubled about capital punishment, but argued that Breedlove's responses, when taken as a whole, fell short of demonstrating an inability on her part to consider and impose a death penalty.
The state may challenge for cause any juror disqualified under La.Code Crim.P. art. 798. Notably, a juror is excused in a capital case when the tendered juror:
has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment....
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt.
La.Code Crim.P. art. 798(2).
Removal for cause is grounded in constitutional principles of assuring a fair trial, unlike peremptory challenges, which are grounded in statutory law. Gray v. Mississippi, 481 U.S. 648, 107 *904 S.Ct. 2045, 95 L.Ed.2d 622 (1987). Therefore, even when the state has not exhausted its peremptory challenges, removal of a scrupled but otherwise eligible venireman constitutes reversible error. Removal for cause is limited by Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which makes clear that a state infringes on a capital defendant's sixth and fourteenth amendment rights to a fair and impartial jury when it removes for cause all veniremen expressing conscientious objections to capital punishment. Wainwright v. Witt, 469 U.S. 412, 416, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Those firmly believing that capital punishment is unjust "may nevertheless serve as jurors in a capital case so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The standard used in determining whether a prospective juror may be removed for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424, 105 S.Ct. 844; State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, 1234, cert. denied, Roy v. La., 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997). A trial court has great discretion in matters of a juror's fitness to serve. One reason is that the impact of voir dire cannot fully be conveyed in the written transcript. Witt, 469 U.S. at 424, 105 S.Ct. 844; State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 713, cert. denied sub nom. Williams v. La., 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). A trial court's rulings on challenges for cause, thereby, will not be disturbed unless the record of voir dire as a whole reveals an abuse of that discretion. Witt, 469 U.S. at 424, 105 S.Ct. 844; Roy, 681 So.2d at 1230.
Breedlove had several times indicated her "problem" with capital punishment and that she was "totally against the death penalty." R. at 966. Breedlove conceded that there "could be" circumstances in which she could consider a death verdict, and that she might consider it in cases of mass murder such as the Oklahoma City bombing of the federal building, or in cases where a child had been murdered. Nevertheless, she stated that she would "probably" lean towards life regardless of what a defendant had done. Based on her responses, the trial judge initially denied the state's challenge for cause and brought her back for additional questioning.
When the trial judge asked Breedlove to explain why she did not think she would have been able to vote for the death penalty regardless of the circumstances and the facts, Breedlove responded: "I can't sentence somebody to the death chamber. I can't see myself doing it. It would have to be prettyI would have to see the crime committed myself." R. at 1067-1068. (Emphasis added.) When asked by the trial judge to further explain, Breedlove offered: "[I]f I didn't see it, I would have to be absolutely sure that would be beyond a reasonable doubt, I would have to be absolutely sure that somebody was guilty of something like that before I voted death." R. at 1068-1069. (Emphasis added.)
On that basis, over objection by the defense, the court granted the state's challenge for cause. The trial judge observed that the "heart of the problem" was that the juror equated a vote for death with the burden of proof. The court determined that her voir dire responses as a whole indicated that before she would vote to impose capital punishment, she would require absolute certainty, which was an impossible burden for the state to meet. Breedlove's failure to accept that the law required only proof of guilt beyond a reasonable doubt was an impediment to accepting the law that became apparent only when the trial judge attempted to ascertain the extent to which her views on capital punishment would interfere with fulfilling her duties as a juror.
La.Code Crim.P. art. 798(3) provides that a potential juror may be excused for *905 cause when "[t]he juror would not convict upon circumstantial evidence." Article 797(4) provides for excusing a potential juror for cause when "[t]he juror will not accept the law as given to him by the court." The state's burden does not require absolute certainty, but only that each element be proven beyond a reasonable doubt. La.Code Crim.P. art. 271.
In viewing the circumstances as a whole, we find that the trial court did not abuse its wide discretion in removing Breedlove for cause. It is apparent that Breedlove's views on capital punishment would substantially impair her ability to perform as a juror.
The removal of potential juror Ann Lauelle for cause was likewise based on her objection to capital punishment. Lauelle stated: "I don't believe in the death penalty." R. at 11127. And later: "I just can't imagine killing somebody. I wouldn't want to do it." R. at 1128. Lauelle believed that even the Oklahoma City bomber, if found guilty, should be given life imprisonment. When asked by the state whether anything he had said changed her opinion, she replied: "No, I am still listening." R. at 1185. Although defense now complains that there was no development of questions to ascertain whether she could set aside her feelings and follow the law, it is apparent that defense had its own reasons for finding her unqualified as a juror. The record reveals an inability to face difficult choices,[10] and defense counsel voiced its lack of objection to her removal. Regardless of appellate counsel's assignment of error at this time, the failure to object during voir dire waives any complaint on appeal. La.Code Crim.P. art. 800(A); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 709, cert. denied, Williams v. La., 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998).
This assignment of error is without merit.

GUILT PHASE

Assignment of Error No. Six
Defendant complains that his motion for mistrial was erroneously denied, arguing that the state's alleged indirect reference to defendant's previous criminal record mandated a mistrial pursuant to La.Code Crim.P. art. 770(2).[11] The interchange prompting defendant's complaint took place between the district attorney and Detective Robinson:
Q. You are the lead detective in the State of Louisiana vs. Cedric Edwards?
A. Yes.
Q. Briefly I would like to go back to seizure of the shoes over in Bossier City.
A. Okay.
Q. This was identified to you as the residence of Cedric Edwards?
A. Cedric Edwards, Gwendolyn Morris and Teri Williams.
Q. How did you find that out to be his residence?

*906 A. Through the probation officer.
R. at 1731. The defense counsel objected, the jury was removed, defense counsel moved for a mistrial, and a discussion followed, during which the trial court's offer to admonish the jury was rejected.
A mistrial is warranted under La.Code Crim.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant's rights that even jury admonition could not provide a cure. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Potentially damaging remarks include reference to race or religion, when not material or relevant to the case, and direct or indirect reference to another crime committed or alleged to be committed by the defendant, unless that evidence is otherwise admissible. La.Code Crim.P. art. 770. The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La.1982). Moreover, a comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976) (where reference to a "mug shot" was not unmistakable reference to a crime committed by defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971) (where no crime was evidenced by a police officer's reference to obtaining defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. See State v. May, 362 So.2d 516 (La.1978).
Defense counsel argues that the district attorney, "intimately aware" with the contents of police reports obtained during discovery, "knew that the defendant's address was obtained from the probation officer because that information was in Detective Eatman's report [and] in Detective Robinson's report." Original Brief of Appellant for the Capital Appeal: Sentence of Death at 28.
The record reveals that Detective Robinson's report provides no detail regarding defendant's address. The closest references are notations to "See Det Eatman's report for details of the search" and "See Det Eatman's report for more details of this offense," meaning the Victoria Kennedy murder/Gerald Kennedy beating. R. at 64. The record on page 63 to which the defense counsel cites on appeal, still part of Detective Robinson's report, does refer to defendant's probation officer, but contains no information at all regarding defendant's address or how that information was obtained. Instead, page 63 explains the details of defendant's arrest and that the arrest was accomplished with the cooperation of defendant's probation officer.[12]
Detective Eatman's report, referenced by Detective Robinson and defense counsel, *907 likewise reveals that the defendant's address was not obtained from any probation officer. Instead, Detective Eatman's report demonstrates that the information regarding the address was obtained by following the lead they got from searching the Bottoms Boyz files, locating the name Kevin Earl, and finding the name of a brother listed on his arrest record.[13]
The context of the district attorney's line of questioning does not reveal an intent to elicit inadmissible evidence. Instead it manifests an attempt to trace the path of information for the jury so that they would accept that the most damaging evidence was seized from a place where the defendant had reason to place his belongings. Identity of the murderer was at issue, and the path of information clearly passed through Kevin Earl, the crucial identifying link between the nicknames and information concerning the defendant.
Even if the district attorney had hoped to elicit an impermissible reference to defendant's past criminal conduct, a finding we explicitly do not make, the response, "[t]hrough the probation officer," does not unambiguously point to another crime committed by the defendant. As pointed out by the district attorney in its argument to the court, probation officers have lists of "lots of people" that they keep for investigatory purposes. R. at 1732. Thus, the reference did not unmistakably point to any crime. Furthermore, the remark cannot unambiguously point to defendant in light of the testimony regarding the arrest and incarceration record of Kevin Earl, from whom an identification and informational link was derived.
Detective Robinson was the state's second witness on the morning of January 30, 1997. On the previous afternoon, Detective Eatman testified that Kevin Earl Edwards, the defendant's brother, had been in the penitentiary and that it was through him that information had been obtained.[14] Gerald Kennedy, the last witness to testify on January 29, 1997, testified that Kevin Earl was a Bottoms Boyz member and that "[M]ost of them [Bottoms Boyz members] are in the federal penitentiary." R. at 1613.[15]
*908 Given this earlier testimony which was still fresh in jurors' minds, the natural expectation on the part of the jury would have been that the probation officer referred to by Detective Robinson was not defendant's, but that of his brother Kevin Earl. It is clear that the reference to "the probation officer" did not unambiguously point to defendant.
As the elements of La.Code Crim.P. art. 770(2) have not been satisfied, the defense has failed to prove an entitlement to mandatory mistrial. Therefore, the decision on the motion for mistrial is properly governed under La.C.Cr.P. art. 771.[16]State v. Wingo, 457 So.2d 1159, 1166 (La.1984), cert. denied sub nom. Wingo v. La., 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). Whether a mistrial is warranted under the circumstances is within the sound discretion of the trial judge. State v. Douglas, 389 So.2d 1263, 1267 (La.1980); Wingo, 457 So.2d at 1159. An admonition to the jury to disregard a police officer's remark is an appropriate remedy. La.C.Cr.P. art. 771. State v. Harper, 430 So.2d 627 (La.1983). In the case sub judice, defense counsel rejected the trial court's offer to admonish the jury. We find, as we did in Babin under similar circumstances, that the trial court did not abuse its discretion in denying the motion for mistrial. State v. Babin, 336 So.2d 780, 781 (La.1976).
This assignment of error is without merit.

Assignment of Error No. Eight
Defendant complains it was error for the trial court to admit the DNA evidence at trial, which identified the blood on defendant's tennis shoe as that of Gerald Kennedy. Defendant challenges the trial court's pre-trial ruling that the DNA evidence was admissible, arguing that the evidence failed to meet the standard of reliability required by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, cert. denied sub nom. Quatrevingt v. La., 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996). The defendant attacked the qualifications of state's expert witness, the Polymerase Chain Reaction ("PCR") methodology used to obtain the DNA sample, and the Perkin Elmer data base used for statistical analysis.
The general rule for admissibility of expert testimony is set out in La.Code Evid. art. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The burden is on the party offering the putative expert. But the decision whether to reject or accept the person as an expert falls to the great discretion of the trial court, whose rulings will not be *909 disturbed absent an abuse of that discretion. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied sub nom. Craig v. La., 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). See also Official Comment (d) to Art. 702 (trial courts have broad discretion in determining who should or should not be qualified as an expert, citing 3 J. Weinstein & M. Berger, Weinstein's Evidence § 702[02] (1981)).
The state presented affirmative, uncontradicted evidence that Curtis Knox was qualified in DNA analysis and serology. Knox finished first in his class at Iowa State, had been with the North Louisiana Crime Lab at Shreveport for three and one-half years, had done PCR testing at an FBI laboratory, had special training in PCR DNA extraction, had graduate level courses, and, according to Knox, he and the lab had met every TWGDAM (Technical Working Group on DNA Analysis and Methods, a group comprised of scientists and forensic examiners) requirement. Hence, the trial court had a factual basis for concluding that Knox was qualified by reason of education, skill, knowledge and experience. La.Code Evid. art. 702. The defense failed to undermine the state's showing despite its lengthy cross-examination of Knox. The trial court did not abuse its discretion in accepting Curtis Knox as an expert in the field of forensic DNA analysis.
With respect to scientific evidence, the trial judge acts as a gate-keeper, admitting "pertinent evidence based on scientifically valid principles" (Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)), which evidence has application to the facts of the case. Id. at 592-93, 113 S.Ct. 2786; State v. Quatrevingt, 670 So.2d at 204. The court's evaluation of the evidence must be flexible, with an eye toward reliability and relevancy. Id. at 595, 113 S.Ct. 2786; State v. Foret, 93-0246 (La.11/30/93), 628 So.2d 1116, 1122.
Under Daubert and Quatrevingt, relevant factors determining whether scientific evidence is reliable include:
(1) The "testability" of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
Quatrevingt, 670 So.2d at 204; Daubert, 509 U.S. at 592-95, 113 S.Ct. 2786. Scientific evidence should be admitted whenever the court's balance of the probative value and the prejudicial effect results in a determination that the evidence is reliable and helpful to the triers of fact. Admission of the scientific evidence is within the discretion of the trial judge. Quatrevingt, 670 So.2d at 204.
PCR technology is a means of extracting DNA from very small samples of body tissue.[17]State v. Spencer, CR95-208, CR95-328 (La.App. 3 Cir. 10/4/95), 663 So.2d 271, 274. Its use was challenged by the defendant as not satisfying the Quatrevingt reliability standard for admission of scientific evidence. Defense did not challenge one of the four enumerated factors that of general acceptance in the scientific community. Nevertheless, it is important to mention that, according to Knox, almost all molecular or genetic research utilizes the technique. Its use has been accepted in the legal community as well. At least *910 two federal circuit courts have found PCR analysis reliable and admissible under the standards set out in Daubert. See, e.g., United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied sub nom. Beasley v. U.S., 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997) (which listed, at 1147, n. 4, fifteen state appellate courts admitting DNA evidence derived from the PCR methodology); United States v. Hicks, 103 F.3d 837, 845-46 (9th Cir.1996), cert. denied sub nom. Hicks v. U.S., 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997). A Louisiana court of appeal has also found reliable DNA evidence based on PCR methodology. State v. Spencer, CR95-208, CR95-328 (La.App. 3 Cir. 10/4/95), 663 So.2d 271.
Testability, another Quatrevingt factor, is satisfied if the methodology can be replicated. Rosalyn Bell, Instructing Juries in Genomic Evidence Cases, 36 THE JUDGES' JOURNAL 42 (Summer 1997). The PCR methodology follows a step-by-step procedure. Attached to the crime lab report were Knox's worksheets, calculations and notes, and portions of the extraction manual used in PCR typing. Repeat testing was possible. Moreover, the results are verifiable, given sufficient sample size, by comparison with results obtained by use of another DNA analysis model, notably, RFLP (restriction fragment length polymorphism). See Spencer, 663 So.2d at 274.
Peer review, another Quatrevingt factor, was only briefly alluded to during trial. Knox indicated that many texts explaining DNA testing were available, and defense counsel made reference to the text he was using for DNA information. A complaint regarding lack of peer review does not appear meritorious given the general reference at trial, the widespread use in the forensic community, and the abundance of literature regarding the technique. See State v. Lyons, 324 Or. 256, 924 P.2d 802, 813-14 (1996) (wherein the court noted that a discussion of PCR technology appeared in over 4,000 scientific articles and publications). Furthermore, whether peer review has rendered the methodology reliable can also be ascertained by whether the expert is qualified to interpret the results. Rosalyn Bell,Instructing Juries in Genomic Evidence Cases, 36 THE JUDGES' JOURNAL 42 (Summer 1997). Knox's academic abilities, practical experience at the crime lab and with the FBI lab, and the supervision provided by TWGM-qualified personnel render him qualified.
The final factor in affirming the technique's reliability, probability of error, has also been satisfied. The probability of error was considered low because the procedural methodology was well-defined and standardized to avoid arbitrary results or contamination of samples, and several experimental controls were used.
In this case, the state adduced uncontroverted testimony that PCR-derived analysis and profiling are accurate and reliable, that it represents the forensics-industry standard, that it was carried out in clean rooms with rigorous methodology, quality-assurance protocols, safeguards against contamination, and under "dual read" requirements mandating that Knox and a supervisor confirm results at every step. We see no abuse of discretion in the trial court's finding the PCR methodology reliable.
The defense also complains that the Perkin Elmer data base, used to analyze the DNA data gathered from the PCR methodology, is unreliable. The data base analysis provides information on the statistical frequency of a matching DNA in the population. Knox examined seven traits appearing on the DNA strand, identified the frequency of each as it appeared in the African American population (extrapolated from the Perkin Elmer data base), and multiplied the results together to get a statistical estimate of how frequently an individual would have all seven of the traits which appeared on the sample of DNA analyzed. In this case, Knox concluded that the chances of another African American having the same DNA as Gerald *911 Kennedy, whose blood appeared on the shoelace, was only 1 in 1,300,000.
Defense disputes the expert's conclusion that only 1 in 1,300,000 African Americans might produce the stain on defendant's shoe lace, attacking use of the data base supplied by Perkin Elmer. The defense argues, without support, that DNA samples from two hundred African Americans, who were not necessarily from the Shreveport area where the crime took place, did not provide a reliable data base.
Knox testified that the data base was large enough for statistical accuracy based on statistical genetics theories that a general estimate of the world's DNA types can be extrapolated from a very small sample of persons. Knox also pointed out that there were not very many different types of DNA, and that use of the Perkin Elmer data base was generally accepted in the scientific community. He testified that Perkin Elmer pioneered the PCR technology and forensic use of the technology, and that all laboratories using DNA typing kits purchased from Perkin Elmer used the Perkin Elmer or FBI data bases for their statistical analysis. Knox had experience using the data base and was qualified to interpret the results. The results were also verifiable by comparison with another data base. Finally, Knox explained that the figure of 1:1,300,000 was a conservative estimate. Defendant introduced no contradictory evidence. Based on the record, we find that the trial court did not abuse its gate-keeping discretion in admitting the results of the statistical analysis using the Perkin Elmer data base.
This assignment of error is without merit.

PENALTY PHASE

Assignment of Error No. Nine
Appellate counsel for the defendant[18] complains that the penalty phase closing argument made by defendant's trial counsel was constitutionally unacceptable because it did not properly urge mitigating factors, rational, or legal reasons for jurors to chose life over death. Defendant asks this Court to adopt a per se rule that defense counsel's presentation fell below the level of advocacy acceptable in a capital case. He argues that there was no strategic reason for counsel's approach and that instead of having jurors consider defendant's character and propensities, counsel created a "plebiscite" on the death penalty.
To prevail on a claim of ineffective assistance, a defendant must prove that counsel's performance was deficient, and that defendant was thereby prejudiced "to the extent that the penalty phase was rendered unfair and the sentence suspect." State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1292, cert. denied sub nom. Sanders v. La., 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
In the case sub judice, the options available to defense counsel as he faced jurors in closing were extremely limited. Defendant fell under none of the statutory mitigating circumstances listed in La.Code Crim.P. art. 905.5. The defendant had significant criminal activity and incarceration since the age of seventeen. The defendant himself testified that he was under no mental or emotional disturbance, and a background search and psychological testing failed to produce evidence of a childhood suggestive of an environment poor enough to constitute a mitigating circumstance. The defendant was neither youthful nor under the dominion of another. The violent participation in the homicide was singularly his, and the psychological evaluation indicated no psychosis or any inability to conform his conduct to the requirements of the law. In fact, the defense psychologist testified that he found no evidence of statutory mitigating factors and could urge only non-statutory circumstances, including that the defendant did not blame others for his predicament and possessed good artistic ability. During the *912 penalty phase, jurors were informed that defendant had withheld critical information from his defense team until the morning of his sentencing hearing, and that his alibi story presented during the guilt phase was untrue. Jurors heard defendant's testimony identifying himself as the killer and his explanation that Victoria Kennedy's death, brought about by a second bullet, fired when the barrel was placed against her head as she lay wounded, face down on the floor, "just happened." Jurors also learned that defendant had killed before after very little provocation, and that he had murdered Victoria just two months after his release from prison for the earlier manslaughter conviction. Jurors were also advised that defendant had wanted to testify to "get that off his soul." R. at 2037.
Despite the difficult circumstances presented by the specific facts of the case, defense counsel touched on his client's testimony in a positive way. He urged jurors to consider, in mitigation, that defendant took full responsibility for his actions: defendant blamed neither his parents, a troubled childhood, school problems, nor society. Defense counsel also connected his closing argument to evidence presented during the penalty phase when reminding jurors that defendant is "somebody's father, he is somebody's sweet heart." R.2039. Counsel's observation that killing was wrong, that defendant's death would not bring Victoria back, his reading from the Bible, and his asking jurors to consider how they would feel knowing that they "voted to kill one of the least of God's creatures" (R. at 2038) did not create a plebiscite on the death penalty. Instead, counsel focused jurors' attention on defendant's "intrinsic worth as a human being" (R.2039) despite his wrongdoing and impressed upon jurors the seriousness and finality of their decision. While defense counsel's argument in closing might have better addressed the few non-statutory mitigating factors that existed, we cannot say that counsel had no strategic rationale for its argument in closing,[19] that it fell below an acceptable standard, or that any deficiencies prejudiced defendant to the extent that the sentence was suspect. Failure to persuade is not evidence of ineffectiveness.
This assignment of error is without merit.

CAPITAL SENTENCE REVIEW
Article I, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. Pursuant to La. C.Cr.P.art. 905.9 and Louisiana Supreme Court Rule XXVIII, this Court reviews every sentence of death to determine if it is constitutionally excessive. In making the determination, the Court considers whether the sentence was imposed under the influence of passion, prejudice or arbitrary factors; whether the evidence supports the jury's findings of statutory aggravating circumstances; and whether the sentence is disproportionate considering both the offense and the offender.
Defendant Cedric D. Edwards is a black male, who was 29 years old at commission of the offense. He is a Shreveport native, the oldest of four children born to Eloise Edwards. There was no indication of physical, emotion or sexual abuse in his childhood. There was some hint of alcohol and drug abuse during his high school years. Defendant has a learning disorder *913 but managed to complete the 10th grade. His full scale IQ is 88, in the low average range, as determined by defense psychologist Dr. Mark Vigen. The doctor also found an underlying personality disturbance of an unquantifiable nature which did not rise to the level of mental illness.
According to the pre-sentencing report, defendant has no juvenile record. As an adult he was arrested in 1983 for second degree murder, but that charge was dismissed. Later that same year he was arrested for burglary; the arrest ended his formal schooling.
Defendant pled guilty to the burglary. He served 27 months of a 36-month sentence at L.T.I., and was released in December of 1985. Defendant was arrested twice in 1986. He pled guilty to one charge, unauthorized use of a movable/burglary, and was sentenced to time served. In April of 1988 he shot and killed Kenneth Taylor. He pled guilty to manslaughter and received a fifteen-year sentence. He served seven and one-half years at Wade Correctional Center. While there he obtained his GED. He was released August 29, 1995. He was still on parole when he murdered Victoria Kennedy in October of 1995. No family member appeared on his behalf at the penalty phase. His mother lives in California. When interviewed for the pre-sentencing report, she expressed doubt at Cedric's involvement. She reported that he had never been violent, was artistic, and had a good temperament as a child. He has no work history. The pre-sentencing report contains no data on his siblings.
Defendant has been associated with Teri Williams since 1983. She is the mother of his two children, aged twelve, and ten. He moved into the residence Ms. Williams shared with her mother, Gwendolyn Morris, upon his release from Wade in August of 1995.
In mitigation the defense urged the following non-statutory factors: an early history of drug and alcohol abuse; a learning disorder; a personality disturbance; acceptance of responsibility for his predicament; and artistic temperament revealed by command of spatial relationships. La.Code Cr.P. art. 905.5(h).

Passion, Prejudice or Other Arbitrary Factors
Although the victim was white and the defendant black, there is no indication that race played a part in the crime. The victim, aged forty-eight, was married to a black man, Gerald Kennedy, who was thirty-three. The victim and the defendant did not know each other. Gerald Kennedy and the defendant knew of each other from the neighborhood and from prison. The jury was composed of eleven whites and one black. According to the trial court's Uniform Capital Sentence Report, there was no systematic exclusion of blacks from the jury: the state used ten peremptory challenges, three against African-Americans; and the defense exhausted its peremptory challenges, striking two African-Americans. There were no challenges under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
There is no evidence that any passion, prejudice, or other arbitrary factor influenced the jury in its determination of the death sentence.

Aggravating Circumstances
The state urged three statutory aggravating circumstances: that the offender was engaged in the commission or attempted commission of an aggravated burglary or armed robbery, or that he knowingly created the risk of death to more than one person. La.Code Cr.P. art. 905.4(A)(1), (4).
The state established beyond a reasonable doubt that the defendant knowingly created a risk of death to more than one person, through evidence that he invaded the Kennedy home, murdered Victoria Kennedy and shot and severely beat Gerald Kennedy. This conduct satisfies the aggravated circumstance which exists when, in a single consecutive course of conduct, the offender contemplates and actually *914 causes the death of one person and the risk of death or great bodily harm to at least one other person. State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, 41-42, cert. denied Robertson v. La., 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998).
The state also established the commission of an aggravated burglary and attempted armed robbery beyond a reasonable doubt. Defendant was armed and shot Kennedy outside the kitchen. After Kennedy was unsuccessful at closing and locking the door behind him, defendant entered the apartment while still armed and beat Kennedy while demanding money. These factors fully support the essential elements of aggravated burglary and attempted armed robbery. La.R.S. 14:60; La.R.S. 14:64.
The verdict lists all three aggravated circumstances but connects them with "or." Under similar circumstances, this Court found that the intent of jurors was to find the commission of all listed felonies. See Robertson, 712 So.2d at 43-44.

Proportionality
While the federal constitution no longer requires a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990), cert. denied sub nom. Burrell v. La., 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); La. Sup.Ct. R. 28, § 4(b).
The state's Sentence Review Memorandum reveals that since 1976 jurors in the 1st JDC have returned a guilty verdict in twenty-six capital cases, including this one, and recommended the death penalty six times before this. Four of those cases involved murders committed during the perpetration of an armed robbery. See State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, cert. denied sub nom. Cooks v. La., 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999) (where one victim was fatally shot and two others wounded during the course of an armed robbery committed by defendant and two others); State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied sub nom. Tyler v. La., ___ U.S. ___, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999) (where defendant fatally shot the manager of a fast food restaurant and wounded two others during the commission of an armed robbery); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied sub nom. Davis v. La., 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994) (where defendant fatally shot a convenience store employee during an armed robbery and shot and injured an employee at another convenience store the next day); State v. Ford, 489 So.2d 1250 (La.1986) (where defendant fatally shot a shop owner during an armed robbery), cert. granted, judgment vacated sub nom. Ford v. La., 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (because of racial infirmities regarding jury selection), on remand to State v. Ford, 503 So.2d 1009 (1987). On a statewide basis, this Court has consistently affirmed death penalties in cases involving killings during armed robberies. See, e.g., State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116 (involving double homicide during the commission of an armed robbery/aggravated burglary); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied sub nom. Burrell v. La., 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (where double homicide was committed during an armed robbery); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985) (where double homicide was committed during an armed robbery); State v. Glass, 455 So.2d 659 (La.1984), cert. denied sub nom. Glass v. La., 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), and Glass v. Blackburn, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987) (companion case to Wingo); State v. Narcisse, 426 So.2d 118(La.), cert. denied sub nom. Narcisse v. La., 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983) (killing during commission of armed robbery); and State v. Moore, 414 So.2d 340 (La.1982), cert. *915 denied sub nom. Moore v. La., 463 U.S. 1249, 104 S.Ct. 38, 77 L.Ed.2d 1456 (1983) (fatal stabbing accompanying rape and robbery).
In the case sub judice defendant shot the murder victim twice in the head at close range, and shot and beat the other victim to the point of semi-consciousness, possibly shooting him in the head as well. A comparison with similar cases indicates that the death penalty would not be disproportionate considering the offense and the offender.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution, as provided by La. R.S. 15:567, until: (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
AFFIRMED.
LEMMON, J., concurs and assigns reasons.
LEMMON, J., Concurring.
Because La.Code Crim. Proc. art. 770(2) provides for a mandatory mistrial when a court official refers, in the presence of the jury, to another crime committed by the defendant, prosecutors must carefully avoid the temptation to take a cheap shot that conveys to the jury the fact of a prior conviction that is otherwise inadmissible.
During the examination of a police officer in this case, the prosecutor asked how the officer knew defendant's address where the critical evidence was found. The officer answered that the information was obtained through the probation officer. Defense counsel immediately objected and moved for a mistrial under Article 770(2), but the trial judge denied the motion.
The prosecutor, who was a court officer, obviously asked the question, not to secure totally irrelevant information,[1] but rather to orchestrate a communication to the jury that defendant had been convicted of another crime and was on parole at the time of this crime. The prosecutor asked the question with full knowledge that the answer would be extremely prejudicial to defendant, but nevertheless deliberately elicited the totally irrelevant and highly prejudicial information. Since eliciting the information could serve no other purpose, one can only conclude that the prosecutor asked the question in order to get inadmissible, but highly prejudicial, information before the jury.
Nevertheless, this was an indirect reference that, as the majority points out, did not "unmistakably" point to evidence of another crime, and the testifying witness, although prompted by a court official, was not himself a court official. Inasmuch as a mandatory mistrial was not required and the misconduct occurred during the guilt phase where defendant's identity was clearly established beyond a reasonable doubt, I concur in the decision.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] Five weeks after the murder, police recovered the victim's TEC-9 from a stolen car being driven by two teenagers who had no connection to the murder. The weapon bore tiny blood spots, which analysis could only determine was human.
[2] La.R.S. 14:60 provides in pertinent part:

Aggravated burglary is the unauthorized entering of any inhabited dwelling, ..., with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
. . . .
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
[3] La.R.S. 14:64(A) provides:

Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
[4] In response to threats against the family, Victoria purchased guns for their home and store, including the TEC-9.
[5] Defendant was convicted of manslaughter and had been released from prison for the offense just two months before he killed Victoria Kennedy.
[6] After defendant admitted that he shot both Kennedy and Victoria, the district attorney asked him to name the two others defendant said were with him. Defendant only replied: "I said I accept responsibility for what happened." R. at 2026.
[7] Dr. George McCormick, II, coroner in the instant case, provided a description of Victoria's head wounds and explained in detail the basis of his opinion. Dr. McCormick testified that the first gunshot, fired just inches from her head, was not fatal. The second bullet was fired "with the gun held against the back of her head" and was characterized as the "assassination wound." R. at 1842.
[8] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[9] Cases cited by the defendant, notably, Dawson v. Delaware, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), and State v. Demery, 324 So.2d 418 (La.1975), do not support his claims. In Dawson v. Delaware, defendant was convicted of capital murder and other crimes committed after an escape. At the sentencing phase there was a stipulation to defendant's membership in the Aryan Brotherhood. The prosecutor claimed that its expert would show that the Brotherhood was a white racist prison gang associated with drugs, violence, and inmate murder, but then failed to produce evidence to that effect. The United States Supreme Court found that defendant's First and Fourteenth Amendment rights had been violated. The Court explained that without the presentation of evidence, the prejudicial information was not relevant. The Court distinguished the case from one in which the evidence of the group's philosophy toward violence had been presented by the prosecution. Thus, the Court held that admission of the stipulation was error, and remanded the case for a consideration of whether the admission was harmless error.

In State v. Demery, this Court rejected complaints over the prosecutor's description of the defendant as a "gunslinger," observing that the "evidence ... justifie[d] the inference" as defendant himself had testified that he was always armed and had shot at the victim earlier in the day. 324 So.2d at 420. Clearly, neither case bolsters defendant's assertion.
[10] When pressed for her views on whether Charles Manson should receive a death sentence, the following exchange took place:

Lauelle: All of those things are depressing to me.
Prosecutor: Yes, ma'am. And I hate to have to ask you these questions but I do.
Lauelle: I hate it that I have to be here for my birthday, too.
R. at 1129.
[11] La.Code Crim.P. art. 770 provides in pertinent part (Emphasis added.):

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
. . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
[12] The report states:

On 10-30-95 I wrote and [sic] arrest warrant and affidavit for the arrest of Cedric Edwards. While writing the warrant I had been in tocuh [sic] with Edwards' probation officer John Peka. I explained to him the circumstances as to what occurred. P.O. Peka explained to me that Edwards had been in his office earlier in the week seeking a permit pass to travel to Ca. to be with his mother, who was having surgery. Edwards was slated to be in the office that day of 10-30-95. I requested of Peka that if Edwards returned to detain him on probable cause and we would take him into custody.
After the warrant and affidavit was completed Det Eatman and I met with ADA Steve Waller at the DA's screening section offices. ADA Waller approved the warrant and we were to get Judge Walker to sign the warrant into effect. Just prior to leaving Peka paged me and I returned the call. He had Edwards in his office detained. After talking with Peka I located Walker who signed the warrant into effect. I then called SPD HQ's and requested offices go to probation and parole office, contact Peka and arrest Edwards under Warrant #95W4850.
[13] Detective Eatman's report provides:

[Gerald Kennedy] could not think of his real name but stated that his brother's name was Kevin Earl and he was known as a "Bottoms Boyz" gang member. He did not know Kevin Earl's last name but states that the man that shot him had recently been released from Wade Correctional Facility. Kennedy told us to call his uncle to get the suspects [sic] real name. So I contacted Mr. Don Kennedy who knew who I was talking about but could not recall the suspects [sic] name.
Myself and Detective Robinson then returned to the station where he did some research on the Bottoms Boyz finding an arrest record on Kevin Earl Edwards which listed his brother Cedric Edwards that showed to be incarcerated at Wade Correctional at the time of Kevin Earl's arrest. I contacted Captain Jack Hammell at Wade Correctional and was advised that Cedric Edwards was released from there on 08-29-95. He was there for manslaughter and had been arrested by Shreveport homicide detectives in 1988. Hammel advised me that his parole officers [sic] phone number was 676-7040. That phone number is the states' [sic] Shreveport Probation and Parole Office. He also advised me that the last given address was his girlfriends [sic] at ... in Bossier City, Louisiana. The girlfriends [sic] name is Teri Williams.
R. at 45. (Emphasis added.)
[14] Detective Eatman testified at trial that Kevin Earl "would be Cedric Edwards' brother. That is how we obtained Cedric Edwards' identity, his name." R. at 1585. On re-cross examination of Detective Eatman by defense counsel, the following exchange occurred:

Q. Do you know that [Kevin Earl] was in the penitentiary at the time this occurred?
A. Yes, sir. I know that he
. . .
Q. And do you know for a fact that Kevin Earl Edwards was in the penitentiary on October 27, 1995?
A. I am not real certain if he was or he was not, but that is how we obtained our information through background checks.
R. at 1587. (Emphasis added.)
[15] Kennedy had explained that he had former drug convictions and was currently serving time on a contempt charge for refusing to testify against any more Bottoms Boyz members after his wife's murder. His testimony that most gang members were in jail was in response to a question about where they were.
[16] Art. 771 provides:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial... when the remark is ... of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
[17] Knox explained that PCR technology had an advantage over other methodologies of DNA extraction and analysis because testing could be accomplished on much smaller samples of blood, or other, evidence. After finding a bloodstain, the blood goes through an extraction procedure. The DNA is then "amplified" so that a small portion of the DNA molecule is "blown up" and "xeroxed" to produce sufficient quantities of DNA pieces to be able to type it. Knox further testified to the use of several "controls," consistent with industry standards, which verified that no contamination had occurred during operation of the procedure.
[18] The record shows that defendant had a different counsel for trial than for his appeal.
[19] Appellate counsel makes much of the fact that the jury was "death qualified." However, "death qualified" does not indicate a propensity to issue a sentence of death; it merely means that the juror is able to consider both a sentence of death or life imprisonment should a murder conviction be found. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In light of the damaging testimony from defendant's own mouth, the obvious lack of statutory mitigating circumstances, and the scant amount of non-statutory mitigating circumstances by which to massage the jurors into issuing a life sentence, defense counsel had little choice but to remind the jurors that issuing a life sentence would have an emotional, if not moral, impact on each of them. Counsel's argument needed to influence only one juror. La.Code Crim.P. art. 905.8.
[1] The information sought by the question was absolutely and totally irrelevant to any issue in the case. The source of the officer's knowledge of defendant's address did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. Code Evid. art. 401.