|.LEON A. CANNIZZARO, JR., Judge.
The defendant, Delacie Phillips, was convicted of a first degree murder committed on July 22, 2001. He is now appealing his conviction.
STATEMENT OF THE CASE
Mr. Phillips was indicted on one count of first degree murder of Byron Cotton in violation of La. R.S. 14:30. Cassius Conaler was named as a co-defendant in the same indictment. Mr. Phillips was arraigned, and he entered a not guilty plea. Hearings were conducted on several pretrial motions. A motion to sever filed by Mr. Conaler was granted. Mr. Phillips was tried before a twelve person jury, which returned a verdict of guilty as charged. At the penalty phase of the trial, the jury made a determination to sentence Mr. Phillips to life imprisonment. Approximately three weeks later, the trial court denied a motion for a new trial and after sentencing delays were waived formally sentenced Mr. Phillips to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. He was also granted an appeal.
I ¡.STATEMENT OP THE FACTS
Justin Moore testified at the trial regarding the facts surrounding the shooting death of Mr. Cotton. Mr. Moore said that he had known Mr. Phillips for approximately ten years but that he had met Mr. Conaler for the first time the day before the shooting. According to Mr. Moore, the shooting stemmed from an armed robbery perpetrated by Mr. Phillips and Mr. Conaler. Mr. Moore and Mr. Phillips discussed robbing two drug dealers from Chicago, who were staying in an apartment in Metairie, Louisiana. Although Mr. Moore had been acquainted with the drug dealers for six months or more, they were known to him only by their nicknames, Dog and Little Dog.
On the day before the shooting, Mr. Moore met with Mr. Conaler and Mr. Phillips to plan the robbery. Mr. Moore also gave Mr. Phillips a Glock .40 caliber semiautomatic handgun to use ■ in connection with the robbery. At approximately 10:00 p.m. that night, Mr. Phillips and Mr. Co-naler called Mr. Moore to arrange the robbery. The three men then met outside the drug dealers’ apartment.
According to Mr. Moore, Mr. Cotton was not involved in the robbery, but he was in Mr. Moore’s car while some of the events connected with the robbery transpired. Because Mr. Moore wanted to protect Mr. Cotton from having any responsibility in connection with the crime, he told Mr. Cotton to remain in the car while he spoke to Mr. Phillips and Mr. Conaler.
Mr. Moore, who was a friend of the drug dealers, originally went into their apartment where he saw a stack of money on a table. He then left the apartment and told Mr. Phillips and Mr. Conaler what he had observed. Mr. Moore then knocked on the apartment door again, and Mr. Conaler forced his way into the apartment, where he and Mr. Phillips robbed Dog and Little Dog. Mr. Moore |3claimed that he did not actually participate in the robbery but that *51 he left the scene in his car with Mr. Cotton after he knocked on the apartment door for the purpose of facilitating the entry of Mr. Phillips and Mr. Conaler into the apartment.
At approximately 3:50 a.m. the morning after the robbery, Mr. Moore saw on his telephone caller ID that Mr. Phillips had called him. He returned the call and spoke with Lisa Washington, Mr. Phillips’ girlfriend, who said that Mr. Phillips and Mr. Conaler had been trying to contact him. She then gave Mr. Moore a telephone number where he could call them. Mr. Moore called the number and spoke with Mr. Conaler, who said that he and Mr. Phillips needed to meet with him so that they could divide the robbery proceeds and give Mr. Moore his share.
The men agreed to meet across from a Frostop in the Algiers section of New Orleans. Mr. Moore drove there with Mr. Cotton. When everyone had arrived, Mr. Moore asked Mr. Phillips to return the gun that Mr. Moore had loaned him. Mr. Conaler then suggested that they all go somewhere suitable to divide the robbery proceeds. Mr. Moore said that they could do this at his girlfriend’s home. His girlfriend and her mother lived on Elizardi Street, which was nearby. Mr. Phillips and Mr. Conaler drove to the Elizardi Street residence in their car, and Mr. Moore and Mr. Cotton drove there in Mr. Moore’s car.
Mr. Moore arrived at his girlfriend’s residence first. When Mr. Phillips and Mr. Conaler arrived, they came up to Mr. Moore’s car and pulled on the car’s rear door handles. Mr. Moore then let them into the back seat of his car. Mr. Phillips sat behind Mr. Cotton, who was sitting in the front passenger seat, and Mr. Conaler sat behind Mr. Moore, who was sitting in the driver’s seat. According to Mr. Moore, he asked how much money had been taken in the robbery, and Mr. Conaler told him that it was twelve thousand dollars. As Mr. Moore was turning around in the Lear, out of the corner of his eye he saw Mr. Phillips holding the gun that he had loaned to Mr. Phillips. He saw Mr. Phillips firing the gun at him, and he then heard two more gunshots. He waited in the car until he thought that Mr. Phillips and Mr. Conaler had left the scene. Mr. Moore then stumbled out of his car and went to the front door of his girlfriend’s residence.
He testified at the trial that his girlfriend’s mother picked him up and took him inside her house. When he was asked at the trial whether he had said anything to his girlfriend’s mother, he testified that he had asked her whether he was going to die, and she said no. He further testified that he then kept saying, “They hit me.” When his girlfriend’s mother asked who had hit him, he' said that “Delate” had hit him. He was trying to say “Delacie”, but she thought that he was saying “they late” instead.
At 4:32 a.m. a telephone call to 911 was received from the residence of Mr. Moore’s girlfriend. The ensuing investigation revealed that Mr. Cotton and Mr. Moore had both been shot in the head while they were sitting in Mr. Moore’s car in front of his girlfriend’s house. Mr. Cotton’s lifeless body was found inside the car. Mr. Moore was critically wounded and was taken to a hospital. After two operations and a lengthy rehabilitation process, Mr. Moore ultimately recovered from the gunshot wound that he suffered.
The lead investigator in this case was New Orleans Police Department Detective John Duzac. When he arrived on the scene of the crime, he directed the crime lab personnel to take photographs of the scene and to collect evidence. He noted that there were bloodstains on the driver’s seat of Mr. Moore’s car and that there was *52 a bullet mark- on its front windshield that indicated that a bullet fired |sfrom inside the car had struck the windshield. The car was also dusted for fingerprints.
Detective Duzac was not able to talk to Mr. Moore for the first week that he was in the hospital, but he continued to communicate with Mr. Moore’s relatives and girlfriend. Three days after the shooting, Detective Duzac learned from Mr. Moore’s mother that her son had named Mr. Phillips as the person who shot him. The day after he received this information, Detective Duzac learned from Mr. Moore’s girlfriend that he had named a second person who was involved in the shooting. The name that he gave to his girlfriend was “Chastity.” Because the names “Chastity” and “Cassius” contain similar sounds, it was assumed that Mr. Moore was referring to Mr. Conaler, whose first name was Cassius. At the trial Mr. Moore confirmed that he was trying to say “Cassius” when he said “Chastity.”
Six days after the shooting, Detective Duzac went to the hospital where Mr. Moore was being treated, and he showed Mr. Moore a photographic lineup that included a picture of Mr. Phillips. Mr. Moore told the detective that he knew Mr. Phillips, and he selected Mr. Phillips’ photograph from the lineup and identified him as the person who had shot him.
At the same time that he showed Mr. Moore the lineup containing Mr. Phillips’ photograph, Detective Duzac showed Mr. Moore a second photographic lineup that contained a picture of Kendrick Cooper, who had been developed as a possible suspect. A telephone call from the residence of Ingrid Nelson[1] on Lang Street in Algiers had been made to the cell phone used by Mr. Moore less than an | fihour prior to the time that the 911 call was made to report the shootings. When Detective Du-zac investigated the call, he learned that Mr. Cooper lived on Lang Street at Ms. Nelson’s house. Therefore, he wanted to determine whether Mr. Moore could identify Mr. Cooper as one of the people involved in Mr. Cotton’s death. Mr. Moore, however, could not identify anyone in the photographic lineup containing Mr. Cooper’s picture.
After Detective Duzac learned that Mr. Phillips lived in Kenner, Louisiana, he engaged the assistance of the Kenner police department in obtaining a search warrant for Mr. Phillips’ residence. Detective Du-zac was looking for blood-stained clothing or shoes, a Glock .40 semi-automatic handgun, and a gray 1990 Chevrolet Baretta that he believed was used by Mr. Phillips to leave the scene of the shootings.
Upon arriving at the residence, the officers who were conducting the search located the vehicle. Inside the residence the officers recovered pants, shoes, a wallet, and Mr. Phillips’ Louisiana identification card and driver’s license. Additionally, during the search, a Bank of Louisiana savings deposit slip dated four days after the shooting, showing a deposit in the amount of one thousand dollars cash, was seized, and it was admitted into evidence at the trial. No blood was found on any of the items that were seized or on the Chevrolet Baretta.
When the warrant was executed, Mr. Phillips was already in police custody. During the execution of the warrant at Mr. Phillips’ residence, Detective Duzac spoke with Mr. Phillips’ girlfriend, Lisa Washington. She had been living with Mr. Phillips at his residence. She told the detective *53 that Mr. Phillips “hangs” with “Justin [Mr. Moore] and Cassius [Mr. Conaler]” and that Cassius’ name and telephone number were recorded on the telephone caller ID at ‘the residence. A |7photograph of the caller ID read-out was made and ultimately admitted into evidence at the trial.
After the search of Mr. Philips’ residence, Detective Duzac compiled a photographic lineup that included a picture of Mr. Conaler. Mr. Moore identified Mr. Conaler from the lineup as the second person involved in the homicide of Mr. Cotton. The next day a search of Mr. Conaler’s home was conducted. Shoes, clothing, Mr. Conaler’s driver’s license, and his telephone bill were recovered. Additionally, an attorney’s business card was found. The card contained a receipt[2] for five hundred dollars that had been paid to the attorney to represent Mr. Phillips.
Mr. Moore gave two taped statements to the police regarding Mr. Cotton’s death. In the first statement Mr. Moore said that he was shot while he was walking outside his car and that he could not remember where Mr. Conaler was when the shooting occurred. A week after that statement, Detective Duzac received a telephone call from Mr. Moore saying that he now remembered what had happened on the night of the shooting. A second taped statement was taken, and in that statement Mr. Moore stated that he was shot while he was inside his car. This statement comported with the evidence. The amount of the blood found in his car indicated that Mr. Moore had been shot there. Mr. Moore also testified at the trial that he did not remember telling his doctors that he did not know who shot him, a statement that was reflected in his medical records.
When Mr. Moore was questioned at the trial regarding the discrepancies in his two taped statements, he explained that he was heavily medicated, that he had Ujust undergone surgery, and that his memory was clouded when he. gave the first statement. He testified, however, that he had recovered his memory when he gave the second statement, which he claimed was accurate.
When Detective Duzac was questioned at the trial regarding the armed robbery of the two drug dealers, Dog and Little Dog, he said that he had not investigated the robbery, because he had no jurisdiction to investigate crimes in Jefferson Parish, where Metairie is located and where the robbery allegedly occurred. He said that the robbery had not been reported to authorities and that he had made no effort to locate Dog and Little Dog.
Dr. Paul McGary, a forensic pathologist, testified at the trial that he had performed an autopsy on Mr. Cotton. He said that Mr. Cotton died from a single gunshot wound to the back of the head. The wound was a contact wound, which meant that the barrel of the gun had been pushed against the skin on the back of Mr. Cotton’s neck.
An expert in ballistics and firearms identification, a fingerprint examiner, a firearms examiner, and a crime lab technician also testified at the trial. Their testimony indicated that there was.no. direct physical evidence that could unequivocally link Mr. Phillips with Mr. Cotton’s death.
The defense called three witnesses at the trial. They were Ms. Washington[3], who was Mr. Phillips’ girlfriend at the time of Mr. Cotton’s death, her daughter, Mallory Washington, and Mr. Phillips’ sixteen-year-old daughter, Detrice Murray.
*54 Ms. Murray testified first. She stated that her father had injured his ankle playing basketball and that he was using crutches at the time of Mr. Cotton’s | fldeath. She also testified that she had overheard her father talking on the telephone to a person named Justin, which was Mr. Moore’s first name. Her father had told Justin that he was wrong to stash “the stuff’ at her father’s house. She also testified that her father washed his clothes at her grandmother’s house and that there was no washer or dryer where he lived.
Ms. Washington’s daughter, Mallory, corroborated Ms. Murray’s testimony that there was no washer or dryer at Mr. Phillips’ residence and that Mr. Phillips was walking on crutches when Mr. Cotton was killed. She also testified that she had heard Mr. Phillips having an argument on the telephone with someone named Justin.
Ms. Washington was the final witness for the defense. She testified that Mr. Phillips left his residence at approximately 10:30 p.m. on the night of Mr. Cotton’s death and that he returned home the following morning at approximately 5:00 a.m. She also testified that Mr. Conaler had telephoned Mr. Phillips after he had returned home that morning but that she had answered the telephone, because Mr. Phillips was in the shower. She also stated that, despite Detective Duzac’s testimony, she never told him that Mr. Phillips washed his clothes when he got home in the morning after the homicide. She stated that there was no washer or dryer in the apartment and that Mr. Phillips usually took his clothes to his mother’s house to be laundered. Ms. Washington also testified that Mr. Phillips and Mr. Conaler were together on the night of Mr. Cotton’s death. Ms. Washington further stated that Mr. Phillips had injured his ankle and was walking on crutches at the time of the shootings. Finally, Ms. Washington identified the bank deposit slip showing a one thousand dollar deposit in Mr. Phillips’ name, and she testified that |inMr. Phillips earned no more than two hundred dollars a week, which he used for paying bills.
ERRORS PATENT
After a review of the record, we find no errors patent.
ASSIGNMENT OF ERROR
Mr. Phillips has raised a single assignment of error. He contends that the evidence was not sufficient to support his conviction, because the State of Louisiana did not negate any reasonable probability that he had been misidentified.
Applicable Law
In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const, amend. XIV, § 1, creates the following standard of review for federal courts reviewing a state conviction:
[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
443 U.S. at 318-19, 99 S.Ct. 2781 at 2788-89 (footnote omitted) (citation omitted).
In State v. Mussall, 523 So.2d 1305 (La.1988), the Louisiana Supreme Court stated that “this court ... recognized that ... the Jackson holding also applies to state direct review of criminal convictions.” Id. at 1309. The Supreme Court in Mussall *55 also recognized that the Louisiana Constitution has a due process | n clause “virtually identical to its Fourteenth Amendment model. La. Const., Art. I, § 2.” Id.
The Supreme Court in Mussall stated that a review of the record in a criminal case does not require the reviewing court to determine whether the reviewing court believes the evidence at the trial established guilt beyond a reasonable doubt. The Supreme Court further stated as follows:
[A] reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any rational fact finder can.... [T]he inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.
523 So.2d at 1309-10 (footnotes omitted). See also State v. Marcantel, 2000-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56, in which the Supreme Court stated that “[w]here there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient stopport for a factual conclusion required for a verdict of guilty.” 2000-1629, p. 9, 815 So.2d at 56 (emphasis added).
In State v. Ash, 97-2061, pp. 4-5 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667, this Court articulated the standard of review that is applicable to a claim that the evidence produced at a criminal trial was constitutionally insufficient to support a conviction. This Court stated:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court [ 12is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld.
In State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, the Louisiana Supreme Court discussed the prosecution’s burden in a criminal case where the defendant’s identity is disputed. The Supreme Court stated that “[w]hen identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt.” 97-1797, p. 12, 750 So.2d at 902. See also State v. Smith, 430 So.2d 31, 45 (La.1983).
Analysis
In the instant case Mr. Phillips does not dispute that Mr. Cotton was a victim of first degree murder, which is defined in La. R.S. 14:30 as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm upon more than one person. La. R.S. 14:30(A)(3). Because he only disputes the identification made by Mr. Moore, we need only address that element of the crime for which Mr. Phillips was convicted.
In noting that there was no physical evidence linking him to Mr. Cotton’s murder, Mr. Phillips attacks the credibility of Mr. Moore. Mr. Phillips claims that Mr. Moore’s testimony should not have been accepted by the jury, because Mr. Moore suffered from memory impairment as a *56 result of the gunshot wound to his head. Mr. Phillips also argues that Mr. Moore’s testimony is suspect, because in the initial taped statement Mr. Moore gave to. the police, the description he gave of where the shooting occurred was inconsistent with the physical evidence. Mr. | ^Phillips argues that the reason the description in the second taped statement corresponds with the physical evidence is that the physical evidence had been discussed in Mr. Moore’s presence in the interim between the first and second statements. Mr. Phillips also claims that there is a reference in Mr. Moore’s medical records to the effect that Mr. Moore told a doctor that he did not know who shot him.
Mr. Phillips also claims that the story about an armed robbery of two Chicago drug dealers was not credible. In support of this argument he contends that Detective Duzac never attempted to locate the victims of the robbery to corroborate Mr. Moore’s story and that Mr. Moore did not know the names of the drug dealers. despite the fact that he claimed to have been friends with them and to have visited shopping malls and girls’ homes with them.
Under the applicable law, it is not our function to assess the credibility of Mr. Moore’s testimony. Instead, we are to determine whether a hypothetical rational trier of fact interpreting all of the evidence in this case could find the essential elements of the crime beyond a reasonable doubt. See, e.g., State v. Mussall, 523 So.2d 1305 (La.1988). In this case Mr. Moore testified that he told his girlfriend’s mother shortly after he was shot that “De-late” shot him. He also testified that he intended to say “Delacie” but could not articulate that word at the time. Mr. Moore has never wavered in his contention that it was Mr. Phillips who shot him and Mr. Cotton. Although there may have been some inconsistencies in his statements to the police, those inconsistencies never involved the identity of Mr. Phillips as the person who shot him.
This case does not involve a situation where the police developed a suspect and then had Mr. Moore identify the suspect. In fact, when the police developed a | upossible suspect on their own, Mr. Moore was not able to identify him. Mr. Moore had known Mr. Phillips for a number of years and has always maintained that Mr. Phillips was the person who shot him and Mr. Cotton.
Additionally, Ms. Washington testified that Mr. Phillips and Mr. Conaler were together on the night of the shooting. Various telephone records that were subpoenaed and presented at the trial corroborated that Mr. Moore, Mr. Phillips, and Mr. Conaler were in telephone contact throughout the evening and the early morning horn's when the alleged robbery and the shootings occurred. Ms. Ingrid Nelson, a friend of Mr. Phillips, testified that Mr. Phillips and another man came to her house shortly before the nearby shootings occurred and used her telephone.
We also note that Mr. Phillips’ contention that the story of the robbery of the two drug dealers was an unbelievable fabrication does not necessarily mean that Mr. Moore’s testimony regarding the subsequent shooting was not truthful. Mr. Moore may well have been unwilling to divulge the real names of the two drug dealers, because he feared retaliation from them. At the time of the trial Mr. Moore had relocated his residence away from New Orleans, and he did not want to reveal where he was living. This clearly indicates that he feared some type of reprisal as a result of his trial testimony.
Finally, it is clear that even in the absence of physical evidence, if the jury believed Mr. Moore’s testimony, then that testimony was a sufficient basis upon *57 which the jury could find Mr. Phillips guilty of first degree murder. The testimony of one witness, if believed by a jury, is sufficient evidence for a conviction. See State v. Marcantel, 2000-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56. In the instant case, the jury was fully apprised of all of the facts relating to any inconsistencies involved in Mr. Moore’s statements. Based on the trial testimony of all of the [ 1Bwitnesses in its entirety, the jury found that Mr. Phillips’ was guilty of the first degree murder of Mr. Cotton. We find that a jury rationally interpreting all of the evidence in this case could find the essential elements of the crime of first degree murder beyond a reasonable doubt. We further find that the prosecution negated any reasonable probability that Mr. Moore misidentified Mr. Phillips as the person who shot him and Mr. Cotton. Based on the foregoing, we find that Mr. Phillips’ assignment of error is without merit.
CONCLUSION
We find no error by the trial court in the conviction or the sentencing of Mr. Phillips. His conviction and sentence are hereby affirmed.
AFFIRMED.

. Ms. Nelson testified at the trial that she knew Mr. Phillips and that he had come "to her house early in the morning prior to the shootings accompanied by another man. She gave permission for the other man to use her telephone.

. The receipt was dated prior to Mr. Cotton's death.

. At the time of the trial Ms. Washington was using Williams as her last name.