ROBERTA. CHAISSON, Judge.
lain this appeal, defendant, Troy Ar-naud, challenges his convictions for second degree murder and obstruction of justice. For the reasons that follow, we affirm defendant’s convictions and sentences.

PROCEDURAL HISTORY

In June of 2011, a Jefferson Parish Grand Jury returned an indictment charging defendant with second degree murder, in violation of LSA-R.S. 14:30.1, and obstruction of justice, in violation of LSA-R.S. 14:13o.!.[1] At his arraignment, defen *1220 dant pled not guilty. The case proceeded to trial before a twelve-person jury on April 16 and 17, 2012. After considering the evidence presented, the jury found defendant guilty as charged on both counts. The trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on the second degree murder conviction and to thirty years | .¡imprisonment at hard labor on the obstruction of justice conviction, to run consecutively. Defendant now appeals.

FACTS

On Saturday, January 29, 2011, Jonathan Pineda dropped off his brother, Marvin Romero-Pineda, at the Daiquiri Zone in Marrero to have a few drinks and to play pool. Jonathan became concerned when Marvin failed to return home. The next day, Marvin’s sister called the police and filed a missing person’s report.
On Monday, January 31, 2011, Jonathan called Timmy Palmisano, the owner of the Daiquiri Zone, and informed him that his brother was missing. Mr. Palmisano reviewed the video surveillance of the bar from January 29, 2011, and observed that Marvin, defendant, and another guy were playing pool, drinking, and talking. The three left together in a car at approximately 6:50 or 6:55 p.m. Mr. Palmisano recognized defendant in the video because defendant frequented his bar.[2]
Detective Derek Johnson of the missing persons section of the Jefferson Parish Sheriffs Office subsequently reviewed the video with Mr. Palmisano.[3] As a result, Detective Johnson developed defendant’s name as one of the persons who left the bar with Marvin and brought defendant in for questioning.
On February 7, 2011, after being advised of his rights, defendant gave a recorded statement, in which he claimed that while walking to the Daiquiri Zone he encountered Gregory Ford, got into Ford’s vehicle, and drove with him to the Daiquiri Zone. As they were shooting pool at the Daiquiri Zone, they saw a Spanish male who bought everyone drinks. When they were leaving, the Spanish |4male asked Ford for a ride. Defendant said that the three of them left the bar and got into Ford’s car, and that Ford dropped him off at his house in Marrero. Defendant claimed that he left Ford with the Spanish male and that he did not know what happened to the Spanish male after that time.
Following his interview with defendant, Detective Johnson spoke with other witnesses and then decided to speak with defendant again to see if he would release any further information. On February 9, 2011, defendant gave a second recorded statement, in which he said that Ford dropped him off at his mother’s house, and not his house as he claimed in his first statement, and that he later walked to his own house. Defendant claimed that at some point that night Ford came to his house and told him that he had blood in the back seat and needed some cleaning supplies. He further claimed that after he gave Ford the cleaning supplies, Ford left and did not return.
Co-defendant Ford gave numerous statements to police during the course of this investigation. In particular, Detective *1221 Brett Beavers of the Jefferson Parish Sheriffs Office conducted six interviews with Ford. Although Ford initially lied in his statements, which he admitted to at trial, he ultimately implicated himself and defendant in Marvin’s murder. On February 10, 2011, Ford led detectives to Marvin’s body which Ford and defendant had hidden in the woods near the River Birch landfill.
During the investigation, a search warrant was executed at defendant’s home. While there, the police officers found a Blackberry cell phone case in the corner of the yard. At trial, Jonathan Pineda identified the cell phone case as the same type of cell phone case that Marvin used. The officers also found some shampoo bottles and a scrub brush by the pool. In addition, the officers noticed that there was charred earth, burn marks, and charred clothing along the fence line |sof the property. Based on their investigation, defendant and Ford were arrested and charged with Marvin’s murder and with obstruction of justice.
At trial, co-defendant Ford testified as to the specifics of the offenses. According to Ford, on January 29, 2011, he and defendant, whom he had known for twelve or thirteen years, went to the Daiquiri Zone where they encountered Marvin. At some point, Marvin, Ford, and defendant left in Ford’s white Dodge Neon. Ford got into the driver’s seat, defendant got into the front passenger side seat, and Marvin got into the back seat. Ford drove away from the Daiquiri Zone and entered his neighborhood. As he did so, Ford knew that defendant intended to rob Marvin.
When they got to the first stop sign, defendant exited the front seat and entered the back seat with Marvin. Defendant demanded money from Marvin, showed Marvin a firearm, and started beating him. When Marvin did not surrender his money, defendant got on top of Marvin’s back, opened the back door on the driver’s side, pushed Marvin’s head outside the car, shot him in the back of the head, and then closed the door. Afterward, Ford drove to defendant’s house.
When they arrived, they took the body out of the car and placed it on the side of the pool in the backyard. Defendant went to the window and asked his wife for cleaning supplies, which she provided. The clothes were subsequently removed from the victim’s body, and the body was washed off. They then placed the body back in Ford’s car in the back seat. Ford drove toward Waggaman and eventually pulled over by a wooded area, as he was directed by defendant.
Ford and defendant took the body out of the car, put it over the fence, and dragged it to the woods. Defendant then shot the victim in the back of the head even though the victim was already dead. The victim’s facial and genital areas were subsequently burned using gasoline that Ford kept in his car to cut grass. [fiAfter the fire, they left and went back to defendant’s house. Later on, Ford was concerned that the police might find blood in his back seat, so he removed the back seat, threw it in a dumpster, and replaced it with another one.
Michael Thornton, a neighbor of defendant, testified at trial as to what he observed on January 30, 2011. According to Thornton, on that day at approximately 4:00 or 5:00 a.m., he was awakened by people talking across the street. When he looked outside, he saw defendant and another individual standing by a picket fence talking to each other. A short while later, one of the gentlemen brought a Shop Vac from the backyard and put it into the back seat of a white car.[4] The person in the *1222 white ear left but subsequently returned. Sensing that something was not right, Thornton continued looking out of his blinds and saw defendant standing over what appeared to be a barrel with something burning in it.
In addition to lay witnesses, there were several expert witnesses who testified at trial. Dr. Dana Trosclair, an expert in the field of forensic .pathology, testified that she performed an autopsy on the victim and determined that the cause of death was two gunshot wounds to the back of the head. She further noted that the victim sustained blunt force injuries on the right forehead and had extensive thermal injury, or burning, to the face, neck, and genital area evidenced by black charring and skin splitting and blistering.
Adriana Perez, an expert in the field of forensic DNA analysis, testified that her testing strongly indicated that blood found in the back seat of Ford’s vehicle and DNA found on the cell phone case belonged to the victim.
Colonel Timothy Scanlan, an expert in the fields of firearms identification, tool mark identification, blood stain pattern analysis, and crime scene | ^reconstruction, testified that the physical evidence in Ford’s vehicle was consistent with Ford’s statement regarding the position of the victim’s body when he was killed, as the source of the victim’s blood was at or near the doorway behind the driver’s side door. Colonel Scanlan also asserted that the evidence tended to corroborate that the victim was subjected to a physical attack as well as a gunshot wound, and he confirmed that the back seat in Ford’s vehicle was not the original one.

OTHER CRIMES EVIDENCE

In his sole assigned error on appeal, defendant argues that the trial court erred when it denied his motion for mistrial based on the improper admission of other crimes evidence during Gregory Ford’s testimony.
At trial, Ford testified about his participation with defendant in the instant offenses. During his testimony, Ford stated that after the victim’s body was set on fire, he and defendant left and went back to defendant’s house. Thereafter, the following exchange occurred:
Q. Did you and he [defendant] discuss what steps you might take to help avoid you getting in trouble with the law? A. Yes, sir.
Q. What did you all discuss?
A. He discussed if I just get anybody involved that someone was going to be harm to me or my family member— Q. Hold on. You’re going to have to say that—
Defense counsel then objected, after which Ford testified as follows:
If something ever get heard by the police or anybody, that someone was going to be harmed, me or my family.
Defense counsel lodged another objection and asked to approach the bench. She argued that this statement was not contained in Ford’s factual basis, and that it | Swas evidence of another crime or bad act. Defense counsel then moved for a mistrial. The trial judge had the jury removed from the courtroom, and the audio recording of Ford’s last answer was played back. After hearing arguments of counsel, the trial judge denied the motion for a mistrial, as follows:
*1223 All right. Let the Record reflect that we did, in fact, listen to the responses, and the Record will be clear. He said, in response to a question what did you all talk about that if the police found out, in essence — and I’m summarizing — that harm could come to me and my family. He did not, he did not say Troy would have someone harm me and my family. He did not say that Troy would harm me and my family. He made a statement, which was a generalization that, obviously, if law enforcement becomes aware of my involvement harm could come to me and my family. That is a very broad and general statement.
Defendant now contends that the trial court erred in denying his motion for mistrial based on the improper admission of other crimes evidence. In particular, he asserts that this testimony was introduced to portray defendant as a person of criminal character who was directly responsible for the victim’s death. Further, defendant claims that Ford’s reference to other crimes during his testimony was not relevant to any genuinely contested issue and contends that the probative value of the evidence was greatly outweighed by its prejudicial effect.
Except under certain statutory or jurisprudential exceptions, evidence of other crimes or bad acts committed by the defendant is inadmissible at trial. LSA-C.E. art. 404(B)(1). State v. Walker, 03-1072 (La.App. 5 Cir. 12/30/03), 865 So.2d 172, 174. LSA-C.Cr.P. art. 770(2) provides that a mistrial shall be granted, upon motion of the defendant, when a remark or comment is made within the hearing of the jury by the judge, district attorney, or a court official, during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. State v. Ventris, 10-889 (La.App. 5 Cir. 11/15/11), 79 So.3d 1108, 1122.
| ¡As a general rule, LSA-C.Cr.P. art. 770 does not apply to testimony by a State witness, since a witness is not considered a “court official.” However, an impermissible reference to another crime deliberately elicited by the prosecutor is imputable to the State and triggers the rule mandating a mistrial. State v. Lagarde, 07-123 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, 1113, writ denied, 07-1650 (La.5/9/08), 980 So.2d 684. In State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999), the Louisiana Supreme Court stated that the “comment must not ‘arguably point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must ‘unmistakably point to evidence of another crime,” and “the imputation must ‘unambiguously’ point to defendant.”
In the instant case, we find that a mandatory mistrial was not warranted pursuant to the provisions of LSA-C.Cr.P. art. 770. Ford was a State witness and, therefore, not a “court official” within the meaning of Article 770. Further, the remark at issue was not deliberately elicited by the prosecutor; rather, it appears that the prosecutor was attempting to elicit information from Ford as to how he and defendant took action to avoid being caught by the police. Lastly, Ford’s comment did not constitute inadmissible evidence of other crimes or bad acts because it did not unmistakably point to evidence of another crime or unambiguously point to defendant. A review of the transcript shows that Ford did not refer to any specific crime or bad act committed by defendant, and that Ford’s comment was vague and ambiguous. As the trial judge noted, Ford did not testify that defendant said he would harm Ford or his family, nor did *1224 Ford testify that defendant said he would have someone harm Ford or his family. Accordingly, a mandatory mistrial was not warranted under the provisions of LSA-C.Cr.P. art. 770.
| inRather, Ford’s comment falls under the discretionary mistrial provisions of LSA-C.Cr.P. art. 771, that govern those prejudicial remarks made by persons other than the court, district attorney, or court officials and provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
[[Image here]]
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Lagarde, 960 So.2d at 1113-14.
In the instant case, it is noted that defense counsel did not request an admonition under Article 771. Further, defendant has failed to show that he was substantially prejudiced by Ford’s comment. Accordingly, we find no abuse of discretion in the trial court’s denial of defendant’s motion for mistrial.
Moreover, even assuming the comment constitutes an impermissible reference to another crime, such an error is subject to a harmless error analysis. The test for determining harmless error is whether the verdict actually rendered in the case was surely unattributable to the error. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102. In the instant case, Mr. Palmisano testified that the videotape showed the victim left the bar with defendant and Ford in Ford’s vehicle. |nFord testified at trial that he knew defendant intended to rob the victim, and he observed defendant shoot the victim in the head. Ford also testified that he and defendant took the body to defendant’s house and cleaned it, and then they disposed of the body in the woods. Lastly, the expert testimony of Colonel Scanlan and Ms. Perez showed that the victim was in the back seat of Ford’s vehicle when he was killed. Thus, given this evidence presented at trial, any error in allowing Ford’s comment can be deemed harmless.
Based on the foregoing, we find that the trial court did not abuse its discretion by denying defendant’s motion for a mistrial.

ERROR PATENT REVIEW

We have also reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals that the trial court failed to fully advise defendant at sentencing of the two-year prescriptive period for filing post-conviction relief. LSA-C.Cr.P. art. 930.8A states in pertinent part, “No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than *1225 two years after the judgment of conviction and sentence has become final.” Here, the sentencing transcript reveals that the trial judge informed defendant that he had “two years for post-conviction relief.”
This Court has previously held that the failure of the trial court to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final renders the advisement incomplete. State v. Holmes, 08-719 (La. App. 5 Cir. 3/10/09), 10 So.3d 274, 283, writ denied, 09-816 (La.1/8/10), 24 So.3d 857. In accordance with this Court’s routine practice, we advise defendant, by this opinion, that no application for post-conviction relief, including [ ^applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. State v. Davenport, 08-463 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied, 09-0158 (La.10/16/09), 19 So.3d 473.
Accordingly, for the reasons set forth herein, defendant’s convictions and sentences are affirmed.

CONVICTIONS AND SENTENCES AFFIRMED

. Co-defendant, Gregory Ford, Jr., was charged in that same indictment with being a principal to second degree murder and obstruction of justice. Ford pled guilty to manslaughter and obstruction of justice and received a sentence of forty years on each count, to run concurrently. On March 13, *1220 2013, this Court affirmed Ford’s convictions and sentences. State v. Ford, 12-717 (La.App. 5 Cir. 3/13/13), 113 So.3d 319, 2013 WL 950875.

. According to Mr. Palmisano, defendant had been coming to his bar for approximately a year. He testified that defendant and a friend used to visit the bar a couple of times a week and that defendant would also come to the bar with his girlfriend to play pool.

. The video from the bar was not shown at trial because it was only kept on the surveillance system for four days.

. Detective Brett Beavers testified that during the search of Ford's residence, a Shop Vac was found in a shed in the backyard and *1222 taken into evidence. Ford admitted in his last statement that he used a Shop Vac to clean his car after the murder. Adriana Perez, the expert forensic DNA analyst, testified that the Shop Vac was submitted to her, but no samples were considered probative in order to move through the further steps of DNA analysis.