# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-848

**STATE OF LOUISIANA**

**VERSUS**

**DANIEL JEREMY ECKERT**

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 89233
HONORABLE SCOTT WESTERCHIL, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Marc T. Amy, Shannon J. Gremillion, and Candyce G. Perret, Judges.

**Perret, Judge, dissents and assigns reasons.**

**CONVICTION AFFIRMED.**

**Hon. Asa Allen Skinner**
**Thirtieth Judicial District Attorney**
**Terry Wayne Lambright**
**First Assistant District Attorney**
**P. O. Box 1188**
**Leesville, LA 71496-1188**
**(337) 239-2008**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Katherine M. Franks**
**Louisiana Appellate Project**
**P. O. Box 1677**
**Slidell, LA 70459-2341**
**(985) 847-1212**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Daniel Jeremy Eckert**

**GREMILLION, Judge.**

Defendant, Daniel Jeremy Eckert, appeals his conviction of second degree murder, a violation of La.R.S. 14:30.1. For the reasons that follow, we affirm.

**FACTS**

On February 10, 2016, Defendant and his wife, Clarissa, were engaged in a physical altercation at their Anacoco, Louisiana, home. Defendant placed Clarissa in a choke hold, where he held her until she passed out. Sometime between 12:00 and 12:30 a.m., Defendant went to the home of his neighbor, Mr. Justin Kay, and asked if he could use his phone because his wife had hidden their phones. Mr. Kay testified that Defendant told him his wife had been drinking, fell, and hit her head on the wall. Defendant told Mr. Kay that he thought Clarissa had broken her neck. Mr. Kay asked if he should call an ambulance, to which Defendant responded that it was too late, "She's cold." Defendant then called 9-1-1.

Deputy Drew Coleman of the Vernon Parish Sheriff's Office was the first authority to arrive on the scene. Defendant was in his back yard. He told Deputy Coleman that he thought his wife had committed suicide. Deputy Coleman entered the home and found Clarissa seated or propped up beside the bed of the master bedroom. Her eyes were open, but her skin was red-purple. She had what appeared to be blood around her mouth and nose.

To preserve the scene, Deputy Coleman began to take photographs of the body and surroundings. The space in which Clarissa's body sat was very close to a wall. In the course of attempting to photograph the body, Deputy Coleman knocked it over when he disturbed the mattress. He replaced the mattress and repositioned the body where it had been. Deputy Coleman also called his supervisor, Deputy Jerry Twyman, who was already en route.

Detective Misti Bryant led the sheriff's office investigation of Clarissa's death. She testified that after she completed her survey of the scene, she proceeded to the sheriff's office, where Defendant had been taken. After advising Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), Detective Bryant interrogated Defendant, who told her that his wife had begun drinking earlier in the evening. Defendant cooked supper, got the couple's two children ready for bed, then went to bed himself. He woke up around midnight and went to the bathroom and found his wife dead on the floor.

Later, Defendant was interviewed by Detectives Bryant and David Vance. In this interrogation, which lasted about four hours, Defendant stated that his wife had retired to the room of his two children, with "her bottle," to watch a television program. He cooked supper and got his kids ready for bed. He and his two children then got into his bed and began watching a DVD movie. Some time later, according to Defendant, Clarissa then began trying to kick the door in before she realized it was not locked. Clarissa was angry at the couple's daughter, Belle. Clarissa entered the room and began to hit and shake Belle. Wyatt, Belle's younger brother, attempted to intervene, but Clarissa hit or pushed him off the bed. At that point, Defendant told the investigators, he seized Clarissa from behind in a choke hold, which he maintained until, he thought, Clarissa passed out. Defendant left Clarissa passed out on the floor and restarted the movie. Later, he awoke and saw that Clarissa was still on the floor. At this point, he discovered that she was dead. He then went to Mr. Kay's home and called 9-1-1.

Belle was interviewed at the Rapides Children's Advocacy Center in Alexandria. Detective Bryant was present, but Bethany Branim conducted the interview. She told the interviewer that her mother entered the room as Belle, her dad, and brother were watching a "dragon show." Clarissa entered the room and

started kicking Belle, telling her to get out of the bed and go to her room. Then Clarissa began hitting Defendant. Defendant then grabbed Clarissa and was "holding on (gestures) to her neck really long and she stopped. . . ." Belle later stated that Defendant held Clarissa for ten seconds. After Clarissa stopped moving, Defendant told Belle that Clarissa was asleep, but Belle thought her mother was dead. She unequivocally identified Clarissa's drinking and behavior as the catalyst for the violence, attributing it to Clarissa's consumption of vodka and Coke. "And when she drunk it every time, she started to be bad and be mean."

A Vernon Parish grand jury indicted Defendant for second degree murder. Several discovery motions were filed by Defendant and the State. The State filed a notice of its intent to introduce evidence of prior domestic violence incidents pursuant to La.Code Evid. art 404.

In response to discovery requests, Defendant identified Rich Clementi and Matthew Larsen as potential expert witnesses. These men were identified as experts in the "naked choke hold." The State moved for a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

Larsen testified that he joined the United States Marine Corps in 1984. While stationed at Marine Barracks Tokyo, he began training in martial arts. This training continued throughout Larsen's duty with the Marine Corps. After leaving the Marine corps, Larsen enlisted in the United States Army. While in the Army, Larsen convinced his then-commander, Stanley McChrystal, that the prevailing methods of hand-to-hand combat training were insufficient. Larsen was tasked with developing new methods, which resulted in Larsen being named Battalion Master Trainer. Larsen went on to become the Regimental Trainer for an Army Ranger Regiment at Fort Benning, Georgia, then Brigade Trainer for an entire Ranger Brigade.

In 2002, Larsen re-wrote the Army Field Manual for hand-to-hand combat. This manual was used to train every active-duty, reserve, and National Guard soldier. Larsen re-wrote the manual in 2009, after he had retired from the Army and had been hired by the Army as Director of its Combatives Program. Mr. Larsen continues to train soldiers, law enforcement officers, and private individuals.

Larsen was questioned about the "rear naked" choke hold. This is a hold taught in hand-to-hand training in the Army. One combatant attempts to restrict the blood flow to the brain by applying pressure to one side of the neck with his biceps and to the other with his forearm, effectively forming a "V" with his arm. The hands are clasped, allowing the holder to apply force with his back muscles. This usually results in the person being held losing consciousness in between ten and twelve seconds, according to literature from the United States Judo Association. After the hold is released, consciousness will return as the blood flow is restored. The hold is called "naked" because it does not rely upon using the held person's clothing to gain mechanical advantage.

The rear naked choke hold is taught in judo to students as young as twelve. The hold is considered a legal hold in Olympic judo competition, as well as in jiu-jitsu and mixed martial arts competitions. The rear naked choke has been taught in the Army since 1905.

On cross-examination, Larsen admitted that he had met Defendant the day of the hearing. In preparation for the hearing, Larsen reviewed the statements given by the witnesses to Clarissa's death. Larsen opined that Defendant employed a rear naked choke hold on Clarissa primarily based upon Belle's description of the incident. He also opined that a rear naked choke hold was used based upon the lack of damage to Clarissa's neck area. Larsen possesses no specialized medical training beyond the type of trauma medicine taught Army Rangers, nor does he have any

forensic training. While he did not necessarily opine that the choke was used correctly Larsen was careful to state that it was not used incorrectly, which would be indicated by damage to Clarissa's esophagus. Larsen has been accepted by a military court as an expert in hand-to-hand combat.

At the close of his testimony, Larsen was offered by Defendant as "an expert in martial arts, specifically, the application of the rear naked chokehold." The trial court granted the State's motion to exclude Larsen as an expert because it did not feel that he was qualified to opine whether the application of a rear naked choke resulted in Clarissa's death. Accordingly, the trial court denied Larsen qualification as an expert witness.

Defendant's jury trial commenced on April 3, 2017. Detectives Bryant and Vance testified as set forth above. Belle testified that "everyone" was asleep in her parents' bed when Clarissa suddenly slapped Defendant in the face. Defendant attempted to slap her back, but instead hit Belle. Belle's parents then started fighting and rolled off the bed, and Defendant began to choke Clarissa on the floor and stopped when he thought she was "asleep." Belle had no recollection of her interview at the Rapides Children's Advocacy Center. That interview was played for the jury.

The State called Dr. Terry Welke, forensic pathologist at the Calcasieu Parish Forensic Center, who performed the autopsy on Clarissa's body. Dr. Welke catalogued the many signs of trauma he noted to Clarissa's body, including bruising on both sides of her head, her chin, breasts, and neck. He opined that Clarissa died from asphyxia, which is a deprivation of oxygen from the brain. There are several means of succumbing to asphyxia, including strangulation, suffocation, exposure to toxic gases, and "positional asphyxia," which occurs when a person becomes incapacitated and falls into a position in which the chin is too close to the chest.

5

Dr. Welke submitted Clarissa's blood for toxicological analysis. Clarissa's blood demonstrated an alcohol concentration of .277 grams per deciliter of blood, roughly four times the limit for intoxication while driving. Clarissa's blood also contained a high level of Hydroxyzine, a sedative. Clarissa's blood measured 477 nanograms per milliliter, and the "normal level is up to 80." "And, so, that means it was elevated. And did she have any reaction to that, I don't know, possibly, maybe a little drowsiness, and in combination with the alcohol, probably so." Dr. Welke did not feel that the hydroxyzine and alcohol combination would have been potentially lethal. Dr. Welke would not express an opinion whether Hydroxyzine can cause seizures.

In Dr. Welke's opinion, whether Clarissa asphyxiated from suffocation or strangulation or positional asphyxia as a result of her being rendered unconscious from a rear naked choke hold was of small import, because all three would be actions of another person that led to her death, which meant that the death was a homicide. He did concede that all of his findings are consistent with positional asphyxia.

On cross-examination, Dr. Welke agreed that bruising can be caused by a number of things, including, in the case of someone with a high alcohol concentration, simply falling down or bumping into objects. He also agreed that Clarissa's neck exhibited no damage to its internal structures. Dr. Welke was familiar with a rear naked choke hold, which he termed a "carotid sleeper," and demonstrated the hold to the jury. In a rear naked choke hold, the choking arm does not close the airway but compresses the blood vessels on the sides of the neck. This hold can result in unconsciousness when applied for between ten and fourteen seconds. A person placed in a carotid sleeper for ten seconds would not die from it. If that person was then sat upright leaning against a bed, she would not likely succumb to positional asphyxia.

6

Defendant called two witnesses to testify. Vernon Parish Chief Deputy Coroner Sharon Green testified as to her crime-scene examination of Clarissa's body. She noted that Clarissa's tongue had been bitten as though Clarissa had experienced a seizure. Nonetheless, Deputy Coroner Green felt that Clarissa's death was a homicide.

Defendant's second witness was Dr. Cary J. Sharp. Dr. Sharp is an emergency physician in Zachary, Louisiana. In preparation for his testimony, Dr. Sharp reviewed the autopsy report, coroner's report, toxicology report, and documented injuries. He also reviewed several published studies related to positional asphyxia. Dr. Sharp has not been trained in forensic pathology. He had been involved in cases of positional asphyxia that were brought to the emergency room.

The State objected to Dr. Sharp's qualification as an expert on the basis of his lack of education and experience. The trial court ruled that an emergency room physician was not qualified to deliver expert testimony of the nature Defendant sought to elicit from Dr. Sharp regarding positional asphyxia. Defendant then sought to offer Dr. Sharp as an expert on the issue of the effects of the combination of alcohol and Hydroxyzine on the human body. The State objected to this qualification of Dr. Sharp as well, arguing that the defense violated the Louisiana Code of Criminal Procedure articles dealing with discovery of expert reports and anticipated testimony. Specifically, the defense had listed Dr. Charles Mize as an expert who would opine that Clarissa died from a combination of alcohol and Hydroxyzine that resulted in positional asphyxia. The trial court refused to allow Dr. Sharp to deliver expert testimony because of his lack of experience in death investigations and on the grounds that posing purely hypothetical questions, as Defendant sought to do, would confuse the jury.

7

Following the disqualification of Dr. Sharp, Defendant rested his case. Defendant exercised his right to not testify. The jury returned a unanimous verdict finding Defendant guilty of second degree murder.

**ASSIGNMENTS OF ERROR**

Defendant contends that the trial court committed the following errors:

1. The evidence is insufficient to demonstrate that Daniel Eckert possessed the specific intent to kill or to inflict great bodily harm.

2. The trial judge erred in denying expert status to two proffered defense witnesses.

3. The actions of the trial judge denied Mr. Eckert his right to present a defense.

**ANALYSIS**

*Sufficiency of the evidence*

In *State v. Hearold,* 603 So.2d 731 (La.1992), the Louisiana Supreme Court stated that when issues of sufficiency of the evidence and other errors are asserted, the issue of sufficiency of evidence should be addressed first. We stated, in *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371 (citations omitted):

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)] standard of review. In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Second degree murder is defined in La.R.S. 14:30.1(A)(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. "Specific intent is the state of mind which exists when the circumstances

8

indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *State v. Carroll,* 95-859, p. 4 (La.App. 3 Cir. 1/31/96), 670 So.2d 286, 288. Specific intent may be inferred from the circumstances of the case and the defendant's actions. *Id.*

Defendant argues that Belle's testimony establishes that he only choked Clarissa for ten seconds. This, Defendant contends, shows that he lacked specific intent to kill or inflict great bodily harm. The State, on the other hand, argues that La.R.S. 14:34.1, defining the offense of second degree battery, defines "serious bodily injury" as "bodily injury which involves unconsciousness. . . ." Because La.R.S. 14:30.1 does not provide a more precise definition of "great bodily harm," we rely upon the legislative expression in defining "serious bodily injury" as a guide in defining "great bodily harm." We do not need to reach this question.

Defendant's interrogation in which he stated that he held the choke hold for ten seconds was played to the jury. Belle's statement to Ms. Branim at the Rapides Children's Advocacy Center was also presented. These both contain references to "ten seconds." However, Belle also stated that Defendant held Clarissa in the hold for a "really long" time. Belle's testimony, as viewed from the stale transcript, can reasonably be read to contrast quite vividly from her previous statement:

Q. Okay, and do you remember how long that he was on the floor choking her?

A. No, sir.

Q. Okay.

A. When um, he'd been choking her, I didn't know time.

Q. Okay. So, when you think back on it, is it something that you're not able to say how long it went on?

A. Yes, sir, I--I definitely didn't know what time was.

Q. Okay.

A.   But now I do know what time is.

Q.   Okay. When you're watching your mom and dad fight did it seem like to you it went on for a long time?

A.   It looked like it was kind of long.

Further along in Belle's testimony, she stated:

A.   She's like, "get off, Dan, get off."

Q.   Okay, so she said it to him. She didn't scream it at him, is that right?

A.   She yelled at him.

Q.   Okay. And did he get off?

A.   No, he kept on choking her 'til she, um, was dead, but he thought she was alive still and asleep. But –

Even if, as Defendant suggests, Clarissa was the aggressor in this confrontation, a reasonable jury could find that she was attempting to withdraw, surrender, or otherwise cease the confrontation, based on Belle's testimony. Thus, any force employed thereafter ceases to constitute self-defense. *See* La.R.S. 14:20. Further, Defendant's assertion that the evidence demonstrates that the choke hold was only applied for ten seconds is not wholly correct; some evidence suggests that, but by no means all. Belle's actual testimony did not establish a ten-second limit to Defendant's choke hold. And a reasonable jury could conclude that a six-year-old child might possess a tenuous grasp of concepts of time.

The elements of second degree murder, as set forth above, are a killing of another with intent to kill or inflict great bodily harm. There is no dispute that Defendant applied a choke hold to his wife; the only question for the jury to decide was his intent. Given the facts elicited at trial, viewed in the light most favorable to the prosecution, including the history of abuse—on the part of both Defendant and Clarissa—in the relationship, the application of a choke hold by Defendant on

10

Clarissa after she seemed to signal her intent to withdraw from the confrontation, and the disputed length of time the choke was applied, we conclude that a rational trier of fact could have found every element of the crime proven beyond a reasonable doubt. This assignment of error lacks merit.

*Exclusion of Matthew Larsen's testimony*

The decision to accept or reject a witness as an expert lies within the great discretion of the trial court and will not be overturned unless that discretion was abused. *State v. Edwards*, 97-1797 (La. 7/2/99), 750 So.2d 893, *cert. denied*, 528 U.S. 1026, 120 S.Ct. 542 (1999). The threshold necessary for the introduction of expert testimony is set forth in La.Code Evid. art. 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

There is no question in our minds that Larsen is an expert in hand-to-hand combat; he literally wrote the book on the subject. However, simply being an expert on a subject does not make one's opinion testimony admissible. The first test of admissibility of opinion testimony is whether it "will help the trier of fact understand the evidence or to determine a fact in issue."

We have already noted that significant discrepancies existed in the accounts regarding the length of time the hold was placed on Clarissa. Larsen's opinions were predicated upon the ten-second application of the hold. A ten-second hold would

not be lethal; a longer hold could be. Larsen was not going to state that the hold was *correctly* applied by Defendant, but was instead going to testify that it was not applied *incorrectly*. Whether the hold was correctly or incorrectly applied, however, was not the issue. How long it was applied was the central inquiry, for upon that inquiry lay the determination of the cause of Clarissa's death and Defendant's intent in applying the hold, be it to calm her, incapacitate her, or kill her.

A trial court's decision to not receive the testimony of an expert witness will rarely result in reversal. *State v. Craig*, 95-2499 (La. 5/20/97), 699 So.2d 865, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343 (1997). This is particularly true where, as in this case, the question of whether a ten-second rear naked choke would result in death was not disputed. Dr. Welke confirmed that it would not. Accordingly, even if we were to conclude that the trial court erred in not admitting Larsen's testimony, that error would be deemed harmless. This assignment of error lacks merit.

*Exclusion of Dr. Cary J. Sharp's testimony*

Dr. Sharp had been an emergency room physician for twenty-two years at the time of trial. Other than cases that presented to his emergency room, Dr. Sharp had no experience in death investigations. He had not received training in forensic pathology. Defendant asserted at trial and in brief that the questioning of Dr. Sharp would have been limited to hypothetical questions related to positional asphyxia and the effects of the alcohol-Hydroxyzine combination. The trial court refused to allow this testimony on the basis that it felt Dr. Sharp was not qualified and that such questioning would confuse the jury.

Even were we to conclude that we would have allowed Dr. Sharp's testimony, we can only overturn the trial court's decision if we conclude that the trial court abused its discretion in refusing to allow the testimony. *Edwards*, 750 So.2d 893. In the present case, given the other evidence in the case and the lack of evidence

12

regarding positional asphyxia, we find no abuse of the trial court's discretion. With regard to the effects of the alcohol-Hydroxyzine combination, we agree with the trial court regarding the potential for confusing the jury. Those effects are relevant to the issue of positional asphyxia, which we have already addressed, and that of whether Clarissa might have suffered a seizure that caused or contributed to her asphyxia. While there was some evidence that she might have suffered a seizure, primarily the bitten or clenched tongue, a critical inquiry of whether to allow expert opinion testimony is the foundation of that testimony in *sufficient* basis in fact or data. We cannot say the trial court erred in this regard.

*Assignment of error three*

Defendant maintains that the exclusion of Larsen and Dr. Sharp as expert witnesses denied him a meaningful opportunity to mount an defense:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi, supra,* or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S., at 485, 104 S.Ct., at 2532; cf. *Strickland v. Washington,* 466 U.S. 668, 684–685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507–508, 92 L.Ed. 682 (1948); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). See also *Washington v. Texas, supra,* 388 U.S., at 22–23, 87 S.Ct., at 1924–1925.

*Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S. Ct. 2142, 2146–47 (1986). Given our discussion above relative to the exclusion of Larsen's and Dr. Sharp's testimonies, we conclude that no "competent, reliable evidence" was excluded at trial. *Id.*

## DECREE

Defendant's conviction is affirmed.

**AFFIRMED.**

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-848

STATE OF LOUISIANA

VERSUS

DANIEL JEREMY ECKERT

PERRET, CANDYCE, J.  DISSENTS WITH REASONS:

I respectfully dissent from the majority opinion that affirms Defendant's conviction of second degree murder.  Specifically, I disagree with the majority opinion that affirms the trial court's ruling excluding Matthew Larsen as an expert witness on choke holds and its finding that "even if we were to conclude that the trial court erred in not admitting Larsen's testimony, that error would be deemed harmless."  Rather, I find that the exclusion of Mr. Larsen's testimony denied Defendant his constitutional right to present a defense, a defense that wanted to explore potential causes of death other than strangulation.  For the reasons stated below, I would reverse Defendant's conviction and grant a new trial.

Defendant offered Mr. Larsen as "an expert in martial arts, specifically, the application of the rear naked choke hold" to support his theory that he countered his wife, Clarissa's, attack on him and their child, with non-lethal force, and that it was due to her drugged and intoxicated state that she fell to the floor where she died of positional asphyxia.  At trial, the State also suggested an alternative theory that Clarissa died from positional asphyxia due to the way she was left by Defendant - in a seated position with her back against the bed.  Thus, the defense in this case was based on showing that Defendant did not intend to kill his wife.  Because the defense was not allowed to present Mr. Larsen's testimony, it was unable to address the weaknesses in the State's case.

1

While the trial court has wide discretion to allow or exclude the testimony of an expert witness, if clearly erroneous, it can be reversed. See *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1239-40, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Under La.Code Evid. art. 702 (emphasis added), "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . **if: (1) [t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ."**

Although the majority finds "[t]here is no question in our minds that Larsen is an expert in hand-to-hand combat" it agrees with the trial court that Mr. Larsen was not qualified to opine whether the application of a rear naked choke hold resulted in Clarissa's death. I find that Mr. Larsen's testimony was not being offered to show that the choke hold did not cause her death but rather was being offered to show that the choke hold, if administered properly and for the time both Belle and the Defendant stated, would only cause unconsciousness and not death. I find this evidence would have helped the trier of fact to better understand the evidence, especially considering Coroner Green's testimony that: (1) Clarissa's tongue had been bitten as though she had experienced a seizure; (2) Clarissa's death was due to asphyxia; and (3) Clarissa had no apparent damage to her esophagus as a result of the hold. I find that Mr. Larsen's opinion that if the choke hold had been administered for only 10-12 seconds, it would not have caused the death of Clarissa, but only unconsciousness, could have supported Defendant's theory that he did not intend to kill his wife. I also find that the use of a non-lethal choke hold is outside the knowledge of the average lay juror.

Because the defense theory, if properly presented, could have sufficiently planted a reasonable doubt in the jury's mind, the exclusion of this evidence was

2

not harmless beyond a reasonable doubt. Accordingly, I find the trial court clearly erred in denying Mr. Larsen's testimony and that Defendant was denied his constitutional right to present a defense to support his argument that he did not intend to kill his wife but only to subdue her.